# United States Court of Appeals
## For the First Circuit

---

No. 04-1517

AROOSTOOK BAND OF MICMACS,

Plaintiff, Appellant,

v.

PATRICIA E. RYAN, EXECUTIVE DIRECTOR, MAINE HUMAN RIGHTS
COMMISSION; LINDA E. ABROMSON, WARREN C. KESSLER, KIM C. MILLICK,
AND PAUL K. VESTAL, JR., MEMBERS, MAINE HUMAN RIGHTS COMMISSION;
LISA GARDINER; TAMMY CONDON; BEVERLY AYOOB,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Margaret J. Kravchuk, U.S. Magistrate Judge]

---

Before

Lipez, Circuit Judge,
and Coffin and Cyr, Senior Circuit Judges.

---

Douglas J. Luckerman, with whom Law Office of Douglas J.
Luckerman was on brief, and Gregory P. Dorr, with whom Farrell,
Rosenblatt & Russell was on brief, for appellant.
G. Steven Rowe, Attorney General, with whom Christopher
C. Taub, Assistant Attorney General, and Paul Stern, Deputy
Attorney General, were on brief, for appellees.

---

April 13, 2005

---

**LIPEZ**, **Circuit Judge**.  This case requires us to decide whether a federal court has jurisdiction to hear an Indian tribe's suit to stop a state agency from investigating tribal employees' complaints of workplace discrimination.  The Maine Human Rights Commission has investigated complaints by three former employees of the Aroostook Band of Micmacs, and asserts that it has the authority to investigate any future complaints, pursuant to Maine antidiscrimination law.  The Band filed this action for injunctive and declaratory relief against the Commission's investigations, arguing that such investigations impermissibly encroach upon the Band's inherent tribal sovereignty, congressionally-affirmed right to self-governance without state interference, and sovereign immunity from judicial or quasi-judicial proceedings.  The district court concluded that the Band's complaint did not invoke a right to relief under federal law, but rather invoked affirmative federal defenses to state law actions, and therefore did not satisfy the well-pleaded complaint rule. Consequently, the court dismissed the action for lack of subject matter jurisdiction.  We reverse.

## I.

The Aroostook Band of Micmacs is a federally recognized Indian tribe.  Over a four month span in 2001, the Band fired three tribal employees: Chief Financial Officer Lisa Gardiner, Compliance Officer Tammy Condon, and Housing Director Beverly Ayoob.  Pursuant to internal tribal procedure, Gardiner and Condon appealed the Band's termination decisions to the Band's Tribal Council, claiming that they were terminated in retaliation for protected activities;

-2-

the Tribal Council affirmed their terminations. Ayoob, who had filed a sexual harassment charge with the Tribal Council before being terminated, did not challenge her termination.[1]

The three ex-employees turned to the Maine Human Rights Commission, a state agency charged with "investigating all forms of invidious discrimination." Me. Rev. Stat. Ann. tit. 5, § 4566. Upon receipt of a private complaint of discrimination, the Commission conducts a preliminary investigation to "determine whether there are reasonable grounds to believe that unlawful discrimination has occurred." Id. § 4612(1)(B). The target of the investigation must cooperate:

> [T]he commission . . . shall have access at all reasonable times to premises, records, documents, individuals and other evidence or possible sources of evidence and may examine, record and copy those materials and take and record the testimony or statements of such persons as are reasonably necessary for the furtherance of the investigation. The commission may issue subpoenas to compel access to or production of those materials or the appearance of those persons, . . . and may serve interrogatories on a respondent to the same extent as interrogatories served in aid of a civil action in the Superior Court.

Id. If the Commission determines that there are "reasonable grounds to believe that unlawful discrimination has occurred," it first attempts to broker a conciliation. Id. § 4612(3). If conciliation fails, the Commission may "file in the Superior Court a civil action seeking such relief as is appropriate, including temporary restraining orders." Id. § 4612(4). Whether or not it

---

[1]Because of the narrow jurisdictional nature of this appeal, the substance of the discrimination charges is not relevant.

-3-

does so, "[t]he complaint and evidence collected during the investigation of the complaint . . . shall become a matter of public record at the conclusion of the investigation. . . . [and] may be used as evidence in any subsequent proceeding, civil or criminal."  Id. § 4612(1)(B).  If the Commission does not itself file a civil action -- and it usually does not -- the complainant may file an action herself.  Id. § 4621.[2]

In the fall of 2001, Gardiner and Condon filed complaints with the Commission alleging employment discrimination on the basis of race, color, and national origin, as well as retaliation, under the Maine Human Rights Act (MHRA), Me. Rev. Stat. Ann. tit. 5, §§ 4551-4634, and the Maine Whistleblowers' Protection Act (MWPA), Me. Rev. Stat. Ann. tit. 26, §§ 831-840.  In the summer and fall of 2002, Ayoob filed two complaints alleging employment discrimination and retaliation under the MHRA and MWPA.  In each case, shortly after receiving the individual's complaint, the Commission filed charges on the complainant's behalf with the United States Equal Employment Opportunity Commission (EEOC) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5.

The Band asked the Commission to dismiss all four complaints on the grounds that it lacked jurisdiction over the Band.  The Commission refused, concluding that it had jurisdiction

_____

    [2]While the complainant can skip the Commission altogether and proceed straight to court, Maine law provides a significant incentive not to do so.  Successful court plaintiffs can recover attorney's fees, civil penal damages, compensatory damages, or punitive damages only if they had exhausted their Commission remedies before filing suit.  Id. § 4622(1).

because the Band is subject to the MHRA, the MWPA, and, for Gardiner and Condon's complaints, Title VII. It investigated the complaints, and on at least two occasions issued document requests to the Band seeking a variety of tribal personnel documents. The Band complied with those requests.

In January 2003, the Commission's investigator issued a report suggesting that there were no reasonable grounds to believe that the Band had discriminated or retaliated against Gardiner or Condon. Before the full Commission could rule on the report, the Band filed a complaint in the United States District Court for the District of Maine against the executive director and members of the Commission (collectively, "Maine"), and the three individual complainants, seeking declaratory and injunctive relief directing the Commission to (1) dismiss the complaints on the ground that the Band is not subject to the MHRA or MWPA, and (2) stop filing complaints against the Band with the EEOC. The complaint, as amended, pled five claims: that the enforcement of the MHRA and MWPA against the Band violates its inherent tribal sovereignty and statutorily codified right to self-governance (Count I); that the enforcement of these state laws against the Band violates its tribal sovereign immunity (Count II);[3] that the Band is exempt from

_____

[3]The complaint relies on three similarly-named but distinct doctrines: tribal sovereignty, tribal sovereign immunity, and a statutory right to self-governance. Although we explain the differences between these below in detail, see infra Parts IV.B-C, we provide thumbnail definitions here. Tribal sovereignty is a common law doctrine recognizing tribes' inherent powers to self-govern, including the power to determine the structure and internal operations of the governing body itself, and exempting tribes from state law that would otherwise infringe upon this sovereignty.

Title VII (Count III); that the Band's exemption from Title VII preempts state antidiscrimination law, and so, regardless of what the MHRA and MWPA say, the Band is not subject to them (Count IV); and that, even under the MHRA and MWPA's own terms, the Band is not an "employer" (Count V).

Shortly after the complaint was filed, the Commission determined that, contrary to its investigator's initial report, there <u>were</u> reasonable grounds to believe that Gardiner and Condon had been retaliated against based on protected conduct. Meanwhile, Gardiner and Condon filed suit against the Band in Aroostook County Superior Court.[4] That court stayed the action pending the outcome of the federal litigation.[5]

In federal court, the parties consented to adjudication by a United States Magistrate Judge, and cross-moved for summary judgment. Although both parties addressed the merits of the Band's claims, Maine also argued that the lawsuit should be dismissed for lack of subject matter jurisdiction.[6] In February 2004, the

Tribal <u>sovereign immunity</u> is a common law doctrine providing that tribes are immune from lawsuits or quasi-judicial proceedings without their consent or Congressional waiver. Finally, the Band claims a statutory right to <u>self-governance</u> deriving from Section 7(a) of the Federal Micmac Settlement Act, which provides that the Band "may organize for its common welfare and . . . act[] in its governmental capacity." 105 Stat. at 1148. According to the Band, this provision reaffirms and codifies the common law doctrine of tribal sovereignty as it applies to the Band.

[4]Again, the merits are not relevant here.

[5]At that point, the Commission had not yet made a determination regarding Ayoob's complaint.

[6]The record does not reveal why Maine did not argue lack of subject matter jurisdiction earlier, by filing a motion to dismiss

district court ruled that it lacked subject matter jurisdiction over the complaint.  See Aroostook Band of Micmacs v. Exec. Dir. Me. Human Rights Comm'n, 307 F. Supp. 2d 95, 96 (D. Me. 2004) ("Micmacs").  Specifically, the district court concluded that Counts I and II did not raise questions "arising under" federal law as required by the applicable jurisdictional statutes, and that Counts III and IV did not allege a justiciable case or controversy.[7]  Consequently, the court dismissed the entire action. See Fed. R. Civ. P. 12(h)(3) (court must dismiss action upon determining, at any point, that it lacks subject matter jurisdiction).  The Band timely appealed.

## II.

The tribal-state relationship between Maine and the Indian tribes located within its borders is complex.  The Band's relationship with the state is particularly complex.  We provide a brief summary of the recent history of that relationship, and include some background concerning three other Maine tribes, to set the stage for the legal analysis that follows.

---

under Fed. R. Civ. P. 12(b)(1).  At any rate, it was proper to raise the issue at summary judgment.  Subject matter jurisdiction may be challenged at any stage.  Fed. R. Civ. P. 12(h)(3).

[7]The Band apparently concedes that Count V does not present a federal claim.  We address later the possibility (not argued by the state) that the federal courts should abstain pending resolution of the state law claim, which might render resolution of the federal issues unnecessary.  See infra Part VI.

**A.          The 1980 Legislation**

In the 1970s, two tribes -- the Penobscot Nation and the Passamaquoddy Tribe -- filed suit claiming much of Maine as their ancestral homelands.  See generally Penobscot Nation v. Fellencer, 164 F.3d 706, 707-08 (1st Cir. 1999) (recounting history).  Neither tribe was federally recognized at that point.  The Aroostook Band of Micmacs was not represented by counsel at the time and was not a party to the litigation.[8]

In 1980, with the aid of the United States, the Penobscots and the Passamaquoddy reached a compromise with Maine. A third tribe, the Houlton Band of Maliseet Indians, which had not filed suit but was represented by counsel and had a potential claim, was later included in the compromise.  See S. Rep. No. 101-291 (1990).  The resulting settlement was embodied in the Maine Implementing Act, Me. Rev. Stat. Ann. tit. 30, §§ 6201-14; see also 25 U.S.C. § 1721(a)(8) ("The State of Maine, with the agreement of the Passamaquoddy Tribe and the Penobscot Nation, has enacted legislation defining the relationship between the Passamaquoddy Tribe, the Penobscot Nation, and their members, and the State of Maine."); Houlton Band of Maliseet Indians v. Me. Human Rights Comm'n, 960 F. Supp. 449, 451-52 (D. Me. 1997).

Under the Act -- which affected "all Indians, Indian nations, and tribes and bands of Indians in the State," Me. Rev. Stat. Ann. tit. 30, § 6204, not just the named tribes -- the

---

[8]Apparently there was some confusion as to whether the Aroostook Band of Micmacs was distinct from the larger Canadian Band of Micmacs.  See generally S. Rep. No. 101-291 (1990).

-8-

Penobscots and the Passamaquoddy received somewhat more advantageous terms than the Maliseets. The Penobscots and the Passamaquoddy obtained territory and all the governmental rights and powers of municipalities within Maine. See id. §§ 6205, 6206, 6211. By contrast, the Maliseets received only land held in trust for them by the United States, and no municipal powers. See id. §§ 6205-A, 6206-A.

In exchange for what the tribes received, and "partly as a result of the Tribes' disputed status, the State of Maine, as part of the settlement, obtained legal authority over the Tribes exceeding the usual state authority over native American tribes." Penobscot Nation v. Georgia-Pac. Corp., 254 F.3d 317, 320 (1st Cir. 2001) ("Penobscot Nation II"), aff'g 106 F. Supp. 2d 81, 82-83 (D. Me. 2000) ("Penobscot Nation I"). Here, too, the tribes did not receive equally favorable treatment. For reasons that will become apparent later, we highlight the special status of the Maliseets.

Before the passage of the Maine Implementing Act, neither Maine nor the United States had officially recognized the Maliseets, and Maine was reluctant to accord them special status. Instead, the Act subjected the Maliseets to Maine law to a greater degree than the Penobscots or the Passamaquoddy. The Maliseets were subject to a default clause applicable to all Indian tribes:

> Except as otherwise provided in this Act, all Indians, Indian nations, and tribes and bands of Indians in the State . . . shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources therein.

Me. Rev. Stat. Ann. tit. 30, § 6204.  However, the Penobscots and Passamaquoddy benefitted from an important exception: for those two tribes, "internal tribal matters, including . . . tribal organization, [and] tribal government . . . shall not be subject to regulation by the State."  Id. § 6206(1).  By contrast, the Maliseets received no such privilege.  Rather, the Act emphasized that "[t]he Houlton Band of Maliseet Indians and its lands will be wholly subject to the laws of the State."  Id. § 6202.

Congress ratified the settlement through the Maine Indian Claims Settlement Act ("MICSA"), 25 U.S.C. §§ 1721-1735.  Among MICSA's purposes were "to ratify the Maine Implementing Act" and "to confirm that all other Indians, Indian nations and tribes and bands of Indians now or hereafter existing or recognized in the State of Maine are and shall be subject to all laws of the State of Maine."  Id. §§ 1721(b)(3)-(4).  MICSA reiterated the distinction between the Maliseets and the other two tribes as to applicability of Maine law:

> Except as provided in [two provisions not relevant here], all Indians, Indian nations, or tribes or bands of Indians in the State of Maine, other than the Passamaquoddy Tribe, the Penobscot Nation, and their members . . . shall be subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land therein.

Id. § 1725(a).[9]

---

[9]We have also assumed that MICSA implicitly incorporates into federal law the "internal tribal matters" exception of the Maine Implementing Act as it applies to the Penobscots and the Passamaquoddy.  See Penobscot Nation II, 254 F.3d at 320-21.

**B.        The Micmac Legislation**

Approximately ten years later, the Band filed aboriginal land claims against Maine. In 1989, Maine and the Band reached a settlement that was memorialized in the Micmac Settlement Act, Me. Rev. Stat. Ann. tit. 30, §§ 7201-7207. The Act generally accorded the Band the same status as the Maliseets, not the greater powers and autonomy enjoyed by the Penobscots and the Passamaquoddy. See id. §§ 7203 (subjecting Band to state laws and court jurisdiction without exception), 7204 (land to be held in trust by United States), 7205 (no municipal powers for Band).

In 1991, at the behest of both Maine and the Band, Congress enacted the Aroostook Band of Micmacs Settlement Act ("Federal Micmac Settlement Act"), Pub. L. No. 102-171, 105 Stat. 1143 (codified at 25 U.S.C. § 1721 note). The Federal Micmac Settlement Act explained that "[t]he Band was not referred to in [MICSA] because historical documentation of the Micmac presence in Maine was not available at that time." Id. § 2(a)(2), 105 Stat. at 1143. Now that such documentation was available, Congress found that "[t]he Aroostook Band of Micmacs, in both its history and its presence in Maine, is similar to the Houlton Band of Maliseet Indians and would have received similar treatment under [MICSA] if the information available today had been available to Congress and the parties at that time." Id. § 2(a)(4). Consequently, the Federal Micmac Settlement Act aimed to "afford the Aroostook Band of Micmacs the same settlement provided to the Houlton Band of Maliseet Indians for the settlement of that Band's claims, to the

-11-

extent [the Micmacs] would have benefited from inclusion in [MICSA]." Id. § 2(a)(5). On this basis, Congress "ratif[ied] the [state] Micmac Settlement Act, which defines the relationship between the State of Maine and the Aroostook Band of Micmacs." Id. § 2(b)(4), 105 Stat. at 1144.

Three provisions of the Federal Micmac Settlement Act are relevant here. First, the Act provides for self-governance: "The Band may organize for its common welfare and adopt an appropriate instrument in writing to govern the affairs of the Band when acting in its governmental capacity." Id. § 7(a), 105 Stat. at 1148.

Second, despite Congress's stated desire to provide the Band with "the same settlement provided to the Houlton Band of Maliseet Indians for the settlement of that Band's claims," id. § 2(a)(5), 105 Stat. at 1143, the Federal Micmac Settlement Act does not explicitly subject the Band to Maine law. Section 6(b) of the federal act, entitled "Laws Applicable," subjects the Band to federal law on the same terms as the other Maine tribes. 105 Stat. at 1148. Nothing in the federal act explicitly subjects the Band to Maine law. By contrast, the earlier MICSA explicitly stated that all Indian tribes other than the Passamaquoddy and Penobscots "shall be subject to the civil . . . jurisdiction of the State, the laws of the State, and the civil . . . jurisdiction of the courts of the State, to the same extent as any other person or land therein." 25 U.S.C. § 1725(a); id. § 1721(b)(4).

Finally, the federal act provided that "[i]n the event of a conflict of interpretation between the provisions of the [state]

-12-

Maine Implementing Act [affecting the Penobscots, Passamaquoddy, and Maliseets], the [state] Micmac Settlement Act, or the [federal] Maine Indian Claims Settlement Act of 1980 and this Act, the provisions of this [Federal Micmac Settlement] Act shall govern." Federal Micmac Settlement Act § 11, 105 Stat. at 1149.

**III.**

Although the issues raised in the Band's complaint go to the heart of its relationship with Maine, this appeal is narrow. As noted, the district court did not reach the merits; rather, it dismissed the complaint for lack of subject matter jurisdiction. Consequently, we do not decide whether the Band's claims have merit, but only whether the district court had subject matter jurisdiction over those claims. In so doing, we review de novo the district court's dismissal. Wang v. N.H. Bd. of Registration in Med., 55 F.3d 698, 700 n.3 (1st Cir. 1995). "In reviewing the dismissal, we construe the Complaint liberally and treat all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995).

Counts I and II against the Commission defendants were dismissed under the well-pleaded complaint rule. Counts III and IV were dismissed for lack of a justiciable case or controversy. We divide our analysis accordingly.

**IV.**

The Band's action seeks to enjoin state officials from enforcing the MHRA and MWPA on the grounds that enforcing those

acts against the Band conflicts with federal law and thus violates the Supremacy Clause of the United States Constitution.[10]  See generally Ex parte Young, 209 U.S. 123, 144-45 (1908) (authorizing such actions).  We must decide whether the complaint pleads an Ex parte Young claim in a manner that establishes federal jurisdiction.[11]

The Band bases its claim of federal jurisdiction on 28 U.S.C. §§ 1331 and 1362.  Section 1331 grants the district courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  Section 1362 grants the district courts jurisdiction over "all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."  The district court dismissed Counts I and II on the grounds that they did not satisfy either §§ 1331 or 1362 under the well-pleaded complaint rule.

---

[10]"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.

[11]The complaint pleads a violation of 42 U.S.C. § 1983, but the Band appears to have abandoned that argument as the litigation progressed.  In light of the Supreme Court's recent statement that a "Tribe may not sue under § 1983 to vindicate the sovereign right" of tribal sovereign immunity, Inyo County v. Paiute-Shoshone Indians, 538 U.S. 701, 712 (2003), the Band probably would not have a colorable § 1983 argument here.  At any rate, in its appellate brief, the Band barely mentions § 1983, and we deem any potential § 1983 argument to be forfeited.  See United States v. Caraballo-Cruz, 52 F.3d 390, 393 (1st Cir. 1995).

-14-

**A.**         **The Well-Pleaded Complaint Rule and <u>Ex parte Young</u>**

The Supreme Court has long construed § 1331 to require "that it be apparent from the face of the plaintiff's complaint either that a cause of action arise under federal law, or at least (in some cases) that a traditional state-law cause of action . . . present an important federal issue." <u>Penobscot Nation II</u>, 254 F.3d at 321 (citation omitted).  Under this rule, "the federal claim or issue [must] appear on the face of 'a well [i.e., properly] pleaded complaint,' so that federal jurisdiction is absent where the federal issue would arise only as a defense to a state cause of action."  <u>Id.</u> (quoting <u>Louisville & Nashville R.R.</u> v. <u>Mottley</u>, 211 U.S. 149, 153-54 (1908)) (second alteration in original).  The same rule applies to claims filed in state court and then removed to federal court under 28 U.S.C. § 1441.  <u>Rossello-Gonzalez</u> v. <u>Calderon-Serra</u>, 398 F.3d 1, 10 (1st Cir. 2004) ("[I]n deciding (for removal purposes) whether a case presents a federal 'claim or right,' a court is to ask whether the plaintiff's <u>claim to relief</u> rests upon a federal right, and the court is to look only to <u>plaintiff's complaint</u> to find the answer.") (quotation marks and citation omitted).

As noted, the Supreme Court has long recognized a federal cause of action for allegations that a state officer's enforcement of state law would violate federal rights.  <u>See Ex parte Young</u>, 209 U.S. at 144-45.  While the Court did not identify a specific federal cause of action in <u>Ex parte Young</u> itself, "'[t]he best explanation of <u>Ex parte Young</u> and its progeny is that the Supremacy

-15-

Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws.'" Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor, 107 F.3d 1000, 1006 (2d Cir. 1997) (quoting Charles Alan Wright et al., 13B Federal Practice & Procedure: Jurisdiction 2d § 3566 (1984)); see also Local Union No. 12004 v. Massachusetts, 377 F.3d 64, 75 & n.8 (1st Cir. 2004) (no "explicit statutory cause of action" is needed for an Ex parte Young action because "'the rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision -- and that such an action falls within the federal question jurisdiction -- is well-established.'" (quoting Richard H. Fallon et al., Hart & Wechsler's The Federal Courts & The Federal System 903 (5th ed. 2003)).

It is simply beyond dispute that a complaint which properly pleads a claim for relief against state officers under the Ex parte Young implied right of action will satisfy the well-pleaded complaint rule. See Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 642 (2002) (there is "no doubt that federal courts have jurisdiction under § 1331" over an action seeking declaratory and injunctive relief against state officials on the grounds that a state regulation was preempted by federal law); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14 (1983) (in unanimous decision, stating that it is "beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights"); Local Union No. 12004, 377 F.3d

-16-

at 74 (<u>Verizon Maryland</u> "eliminates any doubt" that declaratory or injunctive actions against state officials to prevent interference with federal rights qualify for § 1331 jurisdiction);[12] <u>Playboy Enters.</u> v. <u>Pub. Serv. Comm'n</u>, 906 F.2d 25, 30-31 (1st Cir. 1990) (reiterating, despite some uncertainty as to why Supreme Court jurisprudence developed as it did, that federal courts have jurisdiction over an action by "a plaintiff seeking injunctive relief from a state enforcement action, on the ground that state law is preempted by a federal statute").

The above propositions are well-settled and our discussion of jurisdictional principles could end here. After all, we have identified a federal cause of action that will qualify for § 1331 jurisdiction; the only remaining question is whether the Band's complaint properly pleads such an action. However, Maine argues that the principles established in a different line of cases require dismissal. We explain below why Maine's arguments fail. In doing so, we emphasize two fundamental principles. First, under the well-pleaded complaint rule, the <u>plaintiff's complaint</u> is the document in which the federal claim must appear, regardless of

[12]In <u>Local Union No. 12004</u>, a supervisor filed a complaint against a labor union with the Massachusetts Commission Against Discrimination ("MCAD") based on alleged sexual harassment during the course of a labor dispute. 377 F.3d at 69-70. MCAD rejected the union's argument that the complaint was preempted by federal labor law. <u>Id.</u> at 70-71. The union then filed a federal action against MCAD, three commissioners, and the complainant, seeking an injunction and a declaratory judgment that MCAD's proceedings were preempted by federal law. <u>Id.</u> at 71. We held that the union's claims against "a state administrative agency for declaratory and injunctive relief, alleging that the agency has acted in a manner inconsistent with federal law," asserted an <u>Ex parte Young</u> claim and thus satisfied the well-pleaded complaint rule. <u>Id.</u> at 75.

-17-

whether that complaint was filed in federal court pursuant to § 1331, or filed in state court and then removed to federal court pursuant to § 1441. Second, by definition, an Ex parte Young action can only be brought against state officer defendants; the Supremacy Clause implies no right of action against private parties, or by state officers.

By focusing on these points, we can make some sense out of the array of cases invoked by Maine in support of its argument that the Band's complaint runs afoul of the well-pleaded complaint rule. The cases upon which Maine relies -- wherein federal jurisdiction was lacking -- are, quite simply, not Ex parte Young cases. These cases fall into three groups: cases where state officers were not parties at all; cases where state officers were plaintiffs, not defendants; and cases where state officers were defendants, but there was some other serious flaw in the complaint such that Ex parte Young was not properly pled.

1. State officers not parties

Several of the cases on which Maine relies did not even involve state officers -- they were between private parties, or between a tribe and a private party. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667 (1950) (private party v. private party); TTEA v. Ysleta Del Sur Pueblo, 181 F.3d 676 (5th Cir. 1999) (private party v. tribe); Colonial Penn Group, Inc. v. Colonial Deposit Co., 834 F.2d 229 (1st Cir. 1987) (private party v. private party). In such cases, the Ex parte Young cause of action is not available. Therefore, the private plaintiffs' only

federal cause of action in those cases was the Declaratory Judgment Act itself.  In such cases, "[w]hatever federal claim [plaintiff] may be able to urge would in any event be injected into the case only in anticipation of a defense to be asserted by [defendants]," and the Declaratory Judgment Act does not provide an independent basis for jurisdiction.  Skelly Oil, 339 U.S. at 672.

State officers were also absent from Penobscot Nation I/II, the primary case upon which the district court relied in finding that it lacked subject matter jurisdiction.  See Micmacs, 307 F. Supp. 2d at 98-101.  That was a suit by a tribe against a private party.[13]  Indeed, the district court recognized in that case that "[i]f the Tribes were seeking to enjoin state officials, federal jurisdiction would exist, but . . . where, as here, private parties are defendants," Ex parte Young analysis does not apply. Penobscot Nation I, 106 F. Supp. 2d at 83 n.4.

Simply put, where state officers are not even parties -- let alone defendants -- the Ex parte Young cause of action is unavailable.  That is the context in which we stated that the well-pleaded complaint rule "cannot be avoided by having the beneficiary of the [federal] defense assert the defense preemptively in a claim for declaratory or injunctive relief."  Penobscot Nation II, 254

---

[13]In Penobscot Nation I/II, paper companies threatened to sue two tribes in Maine court to compel them to turn over certain documents pursuant to state law.  The tribes sued first in federal court, "seeking an injunction against any state court lawsuit and a declaratory judgment that the Maine Freedom of Access Act violates 'their federal right to be free of such state regulation.'" Penobscot Nation I, 106 F. Supp. 2d at 82 (citation omitted).

F.3d at 321. Consequently, Penobscot Nation I/II -- which Maine describes as "much like this case" -- is in fact completely unlike this case for jurisdictional purposes.

    2.    State officers as plaintiffs

    In the second class of cases, state officers sue a private party in state court and the defendant removes to federal court. See Okla. Tax Comm'n v. Graham, 489 U.S. 838 (1989) (per curiam) (state agency v. tribe in state court);[14] Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983) (state agency v. private party in state court).[15] For jurisdictional purposes, two problems confront such defendants: first, by definition, the action is not an Ex parte Young action, since it has been brought by state officers, not against them; second, it is the state plaintiff's complaint, not the defendant's answer or motion to dismiss, that is analyzed under the well-pleaded complaint rule. In Graham and Franchise Tax Board, the state's complaint pled only

---

[14]In Graham, the state's cause of action derived from Oklahoma tax law. The tribe removed to federal court and raised tribal sovereign immunity as a defense. See 489 U.S. at 839.

[15]In Franchise Tax Board, a state tax agency, seeking to collect unpaid taxes from union members, attempted to levy the sums from the members' accounts in the union's vacation trust. The trust resisted, claiming that the accounts were protected from state levies by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1144(a). The agency sued the trust in state court for the unpaid sums and a declaratory judgment that ERISA did not preempt the state's authority to levy against the trust; the trust removed to federal court. See 463 U.S. at 3-7. The Supreme Court ruled that the state's claim for damages arose under state law, and federal law arose only as a defense. See id. at 13-14. Regarding the state's declaratory judgment claim, the Court held that a state law claim with a federal law defense cannot be converted to a federal claim by seeking a declaratory judgment that the federal defense does not apply. See id. at 14-22.

-20-

state claims, and hence there was no jurisdiction under § 1331. Such removal cases have no bearing on an Ex parte Young action.[16]

Indeed, for Ex parte Young purposes, this class of cases is formally identical to the previous class: the defendant is not a state officer. We have described it separately, however, because of a curious asymmetry. If a private party files an action against state officers alleging that their enforcement of state law violates the private party's federal rights, that is an Ex parte Young action and § 1331 jurisdiction is available. But if the state officers file an action in state court to enforce that very state law, and the private party seeks to remove to federal court on the basis of the same preemption argument, that is not an Ex parte Young action, and there is usually no federal jurisdiction (unless there is some other basis for jurisdiction).

This asymmetry is, however, a virtually inevitable consequence of the fact that, even though an Ex parte Young action is in some ways the mirror image of state prosecution, § 1331

---

[16]Franchise Tax Board itself recognized that had the trust (defendant in the state court action) brought an Ex parte Young action instead of removing to federal court, the outcome might well have been different:

> [Defendant] CLVT might have been able to obtain federal jurisdiction under the doctrine applied in some cases that a person subject to a scheme of federal regulation may sue in federal court to enjoin application to him of conflicting state regulations, and a declaratory judgment action by the same person does not necessarily run afoul of the Skelly Oil doctrine.

463 U.S. at 20-21 n.20.

-21-

jurisdiction is determined from the complaint alone.[17]  In the first example -- where the private party files an _Ex parte Young_ action in federal court -- the federal court looks at the plaintiff's complaint and sees a federal cause of action.  In the second example -- where the state files a state law action in state court and the private party removes -- the federal court looks at the plaintiff's complaint and sees only state law issues.  While this asymmetry may yield odd results or incentives to race to the courthouse, it is a logical consequence of the well-pleaded complaint rule itself.

      3.     Some other defect precludes _Ex parte Young_ jurisdiction

In the third class of cases, the parties are properly aligned for an _Ex parte Young_ action -- the defendants are state officers -- but some other defect precludes _Ex parte Young_ jurisdiction.  The leading example of this class is _Public Service_

---

[17]As one commentator on federal jurisdiction in the Indian law context has noted:

> _Graham_ simply exemplifies the paradox for the well-pleaded complaint rule presented by _Ex parte Young_ actions.  Had the Tribe proceeded in federal court to seek injunctive relief against the state officers imposing the disputed tax, the Tribe would have invoked federal question jurisdiction, for its affirmative claim for relief would have been a cognizable federal cause of action under _Ex parte Young_, thereby 'arising under' federal law.  But because the Tribe instead tried to remove the state court action, it was barred by the well-pleaded complaint rule.

Kaighn Smith, Jr., _Federal Courts, State Power, and Indian Tribes: Confronting the Well-Pleaded Complaint Rule_, 35 N.M. L. Rev. __, __ (43) (forthcoming 2005).

Commission v. Wycoff Co., 344 U.S. 237, 248 (1952).[18]  A widely-cited dictum in that case stated that federal jurisdiction does not extend to declaratory judgment actions that assert federal defenses to state claims.  See id. at 248; see also Franchise Tax Bd., 463 U.S. at 16 (quoting Wycoff).  But, as the Court made clear, the flaw in Wycoff was that, while the complaint sought to resolve a disputed question of federal law, it did not actually assert any federal rights or violations:

> The complainant in this case does not request an adjudication that it has a right to do, or to have, anything in particular.  It does not ask a judgment that the Commission is without power to enter any specific order or take any concrete regulatory step.  It seeks simply to establish that, as presently conducted, [plaintiff]'s carriage of goods between points within as well as without Utah is all interstate commerce.  One naturally asks, so what?  To that ultimate question no answer is sought.

Id. at 244.  The Court held that the complaint did not state a claim for relief under the Declaratory Judgment Act, and was unripe in any event.  Id. at 243-47.  Consequently, it was "not necessary to determine whether . . . the  alleged controversy over an action that may be begun in state court would be maintainable under the head of federal-question jurisdiction."  Id. at 248-49.

---

[18]In Wycoff, the plaintiff (which specialized in transporting film) filed a federal action against a state agency, seeking "(1) a declaratory judgment that [its] carriage of motion picture film and newsreels between points in Utah constitutes interstate commerce; [and] (2) that the Public Service Commission of Utah and its members be forever enjoined from interfering with such transportation over routes authorized by the Interstate Commerce Commission."  Id. at 239.

The oddly deficient complaint in Wycoff might be sui generis among published appellate cases. Indeed, we have found no case in which we applied the Wycoff dictum to a case in the posture of Wycoff itself -- i.e., no case in which we applied Wycoff to an Ex parte Young action and found jurisdiction lacking. At any rate, the flaw in Wycoff is not present here.

4.    Conclusion

Maine's reliance on the well-pleaded complaint rule, when reduced to its essentials, is misguided. The Band seeks injunctive and declaratory relief against the Commission and its officers for purportedly violating its federal rights. Assuming that other requirements of Ex parte Young are satisfied -- e.g., that there is a colorable claim of a federal right -- these claims qualify for "arising under" jurisdiction under the well-pleaded complaint rule.

It is true that the Band's arguments could arise as defenses in a state court action. But a properly framed federal cause of action does not fall outside § 1331 simply because it could also arise as an affirmative federal defense in state court. "[F]ederal jurisdiction is absent where the federal issue would arise only as a defense to a state cause of action." Penobscot Nation II, 254 F.3d at 321 (emphasis added). Just because a federal issue could arise as a defense to a state law action does not mean that the federal issue can only arise as a defense to a state law action. In fact, the federal claims in most Ex parte Young actions could be raised as affirmative defenses to state court actions. But an Ex parte Young action -- "though ultimately

-24-

'defensive' in the sense that it seeks to prevent harms threatened by state officials -- <u>does</u> constitute a federal question under § 1331." <u>Local Union No. 12004</u>, 377 F.3d at 74.

Relying on <u>Penobscot Nation I</u>/<u>II</u>, the district court in this case -- which did not have the benefit of our <u>Local Union No. 12004</u> decision -- decided that it "must look at the individual defendants' MHRA and MWPA complaints as they are tendered in the state court"; hypothesized how those complaints might "play[] out"; and imagined how, in potential state court proceedings, the Band might "answer[] and assert[] as affirmative defenses the contents of their three (non-Title VII) counts in this declaratory action." <u>Micmacs</u>, 307 F. Supp. 2d at 101. It then concluded that the Band's claims could be raised as affirmative defenses, and hence were not part of a well-pleaded federal complaint.

As <u>Verizon Maryland</u> and <u>Local Union 12004</u> make clear, that is not the correct analysis. The question is not whether the allegedly federal claims <u>could</u> be raised as affirmative defenses to a state action, but rather whether they could <u>only</u> be so raised. With an <u>Ex parte Young</u> action, that is clearly not the case. Such an action rests, at bottom, on the implied federal right of action created by the Supremacy Clause. That implied right of action, when properly pled, supplies the basis for "arising under" jurisdiction under § 1331. The question here is whether the complaint properly pleads such a claim.

**B.        Count I (Application of MHRA and MWPA to the Band)**

To analyze Count I's basis for § 1331 jurisdiction, we first sketch its outline; next, we determine whether the rights that the Band alleges are colorable, federal, and potentially preemptive of contrary state laws; and, finally, we examine the state's argument that there is no actual or threatened state enforcement action.[19]

Count I argues that the Commission's investigation of tribal personnel affairs violates two closely related but conceptually distinct federal rights: tribal sovereignty, as inherent to the Band and reaffirmed by Congress when it extended federal recognition to the Band; and a statutory right to tribal self-governance, derived from Section 7(a) of the Federal Micmac Settlement Act.[20] It contends that the latter Act, which finally resolves the Band's legal status and controls any prior law, does not grant the state any jurisdiction over the personnel practices of the Band's governing body.

Count I fundamentally asserts two rights: (1) inherent tribal sovereignty and (2) tribal self-governance under Section 7 of the Federal Micmac Settlement Act. We examine each.

---

[19]We reiterate that this appeal is focused narrowly on jurisdiction. For jurisdictional purposes, "the inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim." Verizon Md., 535 U.S. at 636-37; Penobscot Nation II, 254 F.3d at 322 ("[A] colorable claim of a federal cause of action will confer subject matter jurisdiction even though the claim itself may fail as a matter of law on further examination.").

[20]Although the Band collapses the two in its reply brief, we find it helpful to keep them analytically separate since they arise from different sources.

-26-

1.    Tribal sovereignty

Tribal "retained sovereignty predates federal recognition -- indeed, it predates the birth of the Republic." Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 694 (1st Cir. 1994). "Because of their sovereign status, tribes . . . are insulated in some respects by a 'historic immunity from state and local control,' and tribes retain any aspect of their historical sovereignty not 'inconsistent with the overriding interests of the National Government.'" New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 332 (1983) (citations omitted).

When we speak of a tribe's sovereignty, we mean its powers as a government.  At its apex, tribal sovereignty can include broad powers to determine the form of tribal government; to determine membership; to "enact substantive criminal and civil laws" that apply to tribal members within tribal territory; to regulate domestic relations, such as marriages and divorces, and "the descent and distribution of the property of tribal members"; to impose taxes; to operate court systems and administer justice; and to exclude persons from tribal territory. See Felix S. Cohen, Handbook of Federal Indian Law 246-52 (1982 ed.).  Of course, not all tribes retain the full panoply of these powers today.  A tribe retains those aspects of sovereignty that have not been "withdrawn by treaty or statute, or by implication as a necessary result of [the tribe's] dependent status." United States v. Wheeler, 435 U.S. 313, 323 (1978).  Congress's broad powers over tribes are both "plenary and exclusive," United States v. Lara, 124 S. Ct. 1628,

-27-

1633 (2004) (quotation marks and citation omitted), and "only Congress can abrogate or limit an Indian tribe's sovereignty," Fellencer, 164 F.3d at 709.

One important aspect of tribal sovereignty is "'the power of regulating [its] internal and social relations,'" which includes the "right of internal self-government." Wheeler, 435 U.S. at 322 (citation omitted). A tribe's power to "maintain or establish its own form of government . . . . is the first element of sovereignty." Handbook of Federal Indian Law, supra, at 247. The form of tribal government "may reflect the tribe's determination as to what form best fits its needs based on practical, cultural, historical, or religious considerations." Id.[21]

This right to self-governance may preempt contrary state law. Conceptually, inherent tribal sovereignty is a doctrine of federal common law. See Lara, 124 S. Ct. at 1637.[22] The Supremacy

_____

[21]The phrase "tribal self-government" has been used in two distinct ways. In a broad sense, it can mean a tribe's power to regulate the conduct of tribal members. See, e.g., Wheeler, 435 U.S. at 322 ("Their right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions."). We do not understand the Band to claim that it has this power. A second, narrower sense means the tribe's power to determine the structure and internal operations of the governing body itself. See, e.g., Handbook of Federal Indian Law, supra, at 247. This is the meaning we emphasize.

[22]In Lara, the Court determined the continuing viability of one of its Indian law decisions that Congress had purported to overrule by statute. In Duro v. Reina, 495 U.S. 676 (1990), the Court had held that tribal sovereignty does not empower a tribe to bring a criminal prosecution against non-member Indians. After Duro, Congress enacted a statute "'recogniz[ing] and affirm[ing]' the 'inherent' authority of a tribe" to do just that. Lara, 124 S. Ct. at 1631 (quoting 25 U.S.C. § 1301(2)) (alterations in original). The Lara Court concluded that Duro and other cases limning the

Clause applies to federal common law no less than federal statutes. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 314 (1955) (where the federal courts have the authority to fashion federal common law, "[s]tates can no more override such judicial rules validly fashioned than they can override Acts of Congress"); Sampson v. F.R.G., 250 F.3d 1145, 1153 n.4 (7th Cir. 2001) (unlike earlier "general common law," "the federal common law of today . . . fall[s] under the Supremacy Clause"). Consequently, tribal sovereignty may preempt contrary state law under the Supremacy Clause. "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." Mescalero Apache Tribe, 462 U.S. at 334.[23]

In short, inherent tribal sovereignty is a federal common law right that preempts contrary state law, and is therefore a proper basis for an Ex parte Young action.

_____

bounds of retained tribal sovereignty were construing federal common law, and that Congress could "change 'judicially made' federal Indian law" and adjust that sovereignty. 124 S. Ct. at 1637 (citation omitted).

[23]Whether a particular state interest justifies the assertion of state authority "is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145 (1980). For example, the Court has held that a state cannot require Indian vendors operating on reservation land to collect state cigarette sales tax from Indian purchasers, but it can require them to collect that tax from non-Indian purchasers. See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 480-83 (1976).

        2.        Statutory right to self-governance

        In addition to inherent sovereignty, the Band also asserts a statutory right to self-governance codified in Section 7(a) of the Federal Micmac Settlement Act.[24] The Band further notes that, while MICSA required the governing instruments of the Penobscots, Passamaquoddy, and Maliseets to be "consistent with the terms of [MICSA] and the Maine Implementing Act," the Federal Micmac Settlement Act requires only that the Band's governing instrument be consistent with the terms of the Federal Micmac Settlement Act itself. Compare id. with 25 U.S.C. § 1726(a). And the Federal Micmac Settlement Act -- again unlike MICSA -- does not explicitly subject the Band to Maine law. See supra Part II.B. Finally, the Band argues, while MICSA admittedly makes "all Indians, Indian nations, or tribes or bands of Indians in the State of Maine, other than the Passamaquoddy Tribe[ and] the Penobscot Nation . . . subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person . . . therein," 25 U.S.C. § 1725(a), the Federal Micmac Settlement Act explicitly states that it controls in case of a conflict with the Maine Implementing Act, MICSA, or the State

_____

        [24]"The Band may organize for its common welfare and adopt an appropriate instrument in writing to govern the affairs of the Band when acting in its governmental capacity." 105 Stat. at 1148.

Micmac Settlement Act.  See Federal Micmac Settlement Act § 11, 105 Stat. at 1148.[25]

The complaint anticipates the state's response -- that the Federal Micmac Settlement Act ratified the State Micmac Settlement Act, which did make the Band "subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person . . . therein," Me. Rev. Stat. Ann. tit. 30, § 7203 -- and attempts to neutralize it in two ways.

First, the Band contends that only Congress can make a tribe subject to state law.  Congress did not do so in the Federal Micmac Settlement Act, and in fact it specified that the federal Act controls in the event of a conflict with the state Act.  See Federal Micmac Settlement Act § 11, 105 Stat. at 1148.

Second, the Band contends that the entire State Micmac Settlement Act never took effect.  A provision of that Act provided that "[t]his Act shall be effective only if . . . [w]ithin 60 days of adjournment of the Legislature, the Secretary of State receives written certification by the Council of the Aroostook Band of Micmacs that the band has agreed to this Act."  1989 Me. Laws 149, § 4(2).  That did not happen -- the Band never formally certified that it agreed to the State Micmac Settlement Act as required by

[25]We express no view on whether the Federal Micmac Settlement Act's apparent differences from MICSA or the Maine Implementing Act actually create an inconsistency, let alone a conflict to which Section 11 of the Federal Micmac Settlement Act would apply.  We simply note that it may be necessary to resolve this question in determining the substantive reach of Section 7(a) of the Federal Micmac Settlement Act.

-31-

the Act's terms.[26]  Thus, the Band argues, the State Micmac Settlement Act -- which made the Band subject to the laws of Maine -- never took effect, and is null and void.  Consequently, the federal Act, which purported to ratify the state Act, could not do so, because Congress simply cannot ratify a non-existent state law.

However, the Band continues, the Federal Micmac Settlement Act did implicitly repeal the earlier state and federal legislation -- the Maine Implementing Act and MICSA -- to the extent that they applied to the Band.[27]  Thus, in the Band's view, federal common law and the Federal Micmac Settlement Act are the only applicable law determining the scope of the Band's right to self-governance, and neither subjects the Band to state law.

Despite the complex argument concerning the validity of the State Micmac Settlement Act, "[w]hether a case is one arising under [federal law], in the sense of the jurisdictional statute, . . . must be determined from what necessarily appears in the plaintiff's statement of his own claim . . . , unaided by anything

---

[26]Apparently this provision was added relatively late in the process, and the Band did not realize that certification was required.  The original bill provided that the bill would become effective upon enactment of legislation by the United States, and nothing in the original bill required the Band to certify its assent.  The amendment requiring certification by the Band for the legislation to become effective was added just ten days before the bill was passed.  According to a witness that the Band provided to testify on its behalf pursuant to Fed. R. Civ. P. 30(b)(6), the Band did not send in the written certification only because it was never told about the certification requirement and did not know about it.  However, after the Maine legislature passed the Act, the Band supported its ratification before Congress, and did not express any concern about the state Act's validity.

[27]Unlike MICSA, the Federal Micmac Settlement Act contains no express severability clause.  See 25 U.S.C. § 1734 (MICSA).

alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Graham, 489 U.S. at 840 (quoting Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)) (second and third alterations in original). The Band alleges that it holds a federal right, deriving from Section 7(a) of the Federal Micmac Settlement Act, to self-governance without state interference, and that this right preempts contrary state law. This is a proper basis for an Ex parte Young action.

3. Imminence

Maine's principal response is that, even if a violation of a federal right is alleged, Ex parte Young jurisdiction is not satisfied because here there is no actual or threatened enforcement action by state officials. See Morales v. TWA, 504 U.S. 374, 382 (1992) ("In [Ex parte Young] suits such as this one, which the plaintiff intends as a 'first strike' to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury.") (emphasis added); Ex parte Young, 209 U.S. at 155-56 ("[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings . . . to enforce[,] against parties affected[,] an

unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.").

We have recognized an imminence requirement in Ex parte Young actions, though the extent to which it is jurisdictional (rather than just a substantive element of the action or a limit on equitable discretion) may be subject to debate. See N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1, 4-5 (1st Cir. 2000) (in an action to enjoin criminal prosecution, describing the imminence requirement as "often referred to as a standing requirement" but "probably more complex in character, involving as well concerns about ripeness and the exercise of equitable discretion"); accord Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 847 (9th Cir. 2002) ("We decline to read additional 'ripeness' or 'imminence' requirements into the Ex Parte Young exception . . . beyond those already imposed by a general Article III and prudential ripeness analysis."), opinion amended on other grounds on denial of reh'g, 312 F.3d 416 (9th Cir. 2002). Indeed, in Morales the lack of "imminence" did not divest the district court of jurisdiction; it simply meant that the court should have issued a narrower injunction. 504 U.S. at 381-83. But we need not resolve here the question of whether "imminence" is purely a merits question or also required for jurisdiction, because the Band has adequately alleged a threat of enforcement which would satisfy any jurisdictional requirement.[28]

----

[28]We express no view on whether the Band has alleged a threat of enforcement sufficient to establish the substantive elements of the Ex parte Young claim or for the exercise of the district

-34-

The flaw in Maine's analysis is its assumption that only court proceedings constitute "enforcement," ignoring the threats to tribal sovereignty, self-governance, and sovereign immunity posed by the investigations themselves. Twice in recent years we have found jurisdiction over actions to enjoin state discrimination investigations. See Local Union No. 12004, 377 F.3d at 70-71, 75 (court had jurisdiction over Ex parte Young action to enjoin proceedings of Massachusetts Commission Against Discrimination ("MCAD") on the grounds that state law was preempted by National Labor Relations Act); Chaulk Servs., Inc. v. Mass. Comm'n Against Discrimination, 70 F.3d 1361, 1364, 1371 (1st Cir. 1995) (same, where MCAD's only activity so far had been issuing interrogatories). Similar logic applies here.[29]

Finally, the fact that the target of an investigation yields to the agency's demands and "cooperates" to some degree does not rob the investigation of its coercive power. See, e.g., Major League Baseball v. Butterworth, 181 F. Supp. 2d 1316, 1321 n.2 (N.D. Fla. 2001) (enjoining "civil investigative demand" ("CID")

court's equitable discretion.

[29]To be sure, the Massachusetts Commission differs from the Maine Commission in that Massachusetts courts "accord final decisions of the MCAD preclusive effect," Local Union No. 12004, 377 F.3d at 71 n.6, whereas the Maine Commission "has no authority to issue orders, adjudicate claims, award damages, or make final factual findings that are binding on the parties," Tortilla Flat, Inc. v. Me. Human Rights Comm'n, No. AP-97-024, 1997 Me. Super. LEXIS 194, at *4 (Me. Super. Ct. June 24, 1997). We do not find these differences to be dispositive here. The Band argues that it is not subject to Maine's laws and cannot be made to appear before any Maine tribunal, regardless of that tribunal's particular enforcement powers.

for answers to interrogatories and document production, and noting that "[f]ar from part of a legal proceeding, a CID may be issued only <u>before</u> a legal proceeding is filed . . . . Moreover, it seems likely that the vast majority of CIDs result merely in compliance, with no court proceeding ever filed by anyone, unless the investigation leads to the filing of an enforcement action, which may or may not occur."), <u>aff'd on other grounds</u> <u>sub nom.</u> <u>Major League Baseball</u> v. <u>Crist</u>, 331 F.3d 1177 (11th Cir. 2003). The target has a right to challenge the investigation itself in federal court, and this right is not forfeited by compliance with the investigative demands:

> The recipients of the CIDs had several options available, but only one option could yield the desired result. The most obvious option would have been to comply with the terms of the CIDs. But this option was unattractive because the CIDs were burdensome, and the recipients believed that the federal exemption gave them a "federal right" to be free not only from antitrust <u>prosecution</u>, but also from this <u>investigation</u>. Second, the recipients of the CIDs could have filed suit in state court . . . . This option was similarly unattractive because [of unfavorable and probably incorrect state law]. This left option three: an action in federal court, the present lawsuit.

<u>Crist</u>, 331 F.3d at 1180-81.

Here, the Band had essentially the same choices. By statute, the Maine Commission has the right of "access at all reasonable times to premises, records, documents, individuals and other evidence or possible sources of evidence and may examine, record and copy those materials and take and record the testimony or statements of such persons as are reasonably necessary for the

-36-

furtherance of the investigation."  Me. Rev. Stat. Ann. tit. 5, § 4612(1)(B).  In light of this broad authority, the fact that the Commission did not need to exercise its subpoena power "to compel access to or production of those materials or the appearance of those persons," id., may simply mean that the Band decided to first comply with state law, and then challenge its applicability.

An Indian tribe that is unlawfully called to answer before a state agency may suffer both practical harms and intrusions upon its sovereignty.  As a practical matter, the Band asserts, "[i]nvestigations, interrogatories, and discovery divert the Micmac government from other pressing official matters and consume scarce resources. . . .  includ[ing] the expense of legal consultation during the Commission's investigations and discovery."  Cf. Petroleum Exploration, Inc. v. Pub. Serv. Comm'n, 304 U.S. 209, 215-16 (1938) (jurisdictional amount-in-controversy minimum was met by the "necessary expense of producing the information demanded by the order," which was "not collateral or incidental to the purpose of the injunction, but a threatened expense from which relief is sought").  As a more symbolic matter, simply being called to appear and defend its internal employment practices before a state agency may be an insult to a tribe's sovereignty and right to self-governance.  Cf. Bishop Paiute Tribe v. County of Inyo, 275 F.3d 893, 902 (9th Cir. 2002) (holding that execution of warrant against tribe to obtain employee records violated tribal immunity because "at issue is not just the Tribe's right to protect the confidentiality of its employee records, but the more fundamental right of the Tribe not to have its policies undermined by the

-37-

states and their political subdivisions"), vacated on other grounds sub nom. Inyo County v. Paiute-Shoshone Indians, 538 U.S. 701 (2003); cf. Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 760-761 (2002) (forcing a state to submit to adjudication before a federal administrative agency is an "affront to a State's dignity" because the "State is required to defend itself in an adversarial proceeding").[30]  Sometimes, Congress requires a tribe to submit to such invasions.  We do not comment on whether Congress has done so here -- only that the Band may argue its case in a federal forum.

4.     Conclusion

For § 1331 purposes, Count I adequately alleges that, pursuant to federal common law and the Federal Micmac Settlement Act, the Band possesses both inherent tribal sovereignty and a statutory right to self-governance, and that the enforcement of state law against the Band violates these rights.  Consequently,

_____

[30]Maine argues that this case more closely resembles Reyes v. Supervisor of the DEA, 834 F.2d 1093 (1st Cir. 1987), where the plaintiff argued that an entry in a government file stating that he was a member of a terrorist organization was incorrect and had resulted in more stringent conditions of imprisonment. We affirmed dismissal of his due process challenge because he alleged only harm to his "interest in a good name or good reputation" and not any "continuing infringement of a liberty interest, or that he realistically expect[ed] a repetition of his previous experiences" in prison. Id. at 1098. Reyes is hardly a useful analogue because the Band's interest in self-governance is decidedly greater than a prisoner's interest in correct information in a government file, and the Band may realistically expect to repeat its previous experiences with the Commission.

the district court erred in dismissing Count I for lack of subject matter jurisdiction.[31]

## C.        Count II (Tribal Sovereign Immunity)

Count II alleges that, as a matter of federal law, the Band's tribal sovereign immunity bars the enforcement of state law against it. The difference between the rights asserted in Count I and the tribal sovereign immunity asserted in Count II is subtle but important. The Band's alleged rights to self-governance and tribal sovereignty mean, in essence, that it is not subject to state laws (at least those that purport to regulate the internal governance affairs of the Band itself) <u>at all</u>. By contrast, tribal sovereign immunity means that the Band is not amenable to <u>state judicial or quasi-judicial proceedings</u> to enforce those laws. <u>See</u> Kaighn Smith, Jr., <u>Federal Courts, State Power, and Indian Tribes: Confronting the Well-Pleaded Complaint Rule</u>, 35 N.M. L. Rev. __, __ (24-26) (forthcoming 2005) (contrasting doctrines of infringement of tribal sovereignty versus tribal sovereign immunity). In short, we read Count I to allege that the Band is not subject to the MHRA and MWPA, and Count II to allege that, even if the Band is subject to those acts, it is not subject to the power of any Maine tribunal to investigate and enforce those laws.[32]

_____

[31]Because we hold that the district court had jurisdiction under § 1331, we need not decide whether § 1362 jurisdiction would also be available.

[32]The Band's briefs are not always precise in this distinction, but the complaint adequately separates the concepts. Count I alleges that the Commission's application of the MHRA and the MWPA to the Band violates its "retained inherent tribal sovereignty" and the Federal Micmac Settlement Act. Count II, by contrast, alleges that "[t]he Band's tribal sovereign immunity . . . bars the

"As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity."  Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978).  This immunity applies in state proceedings as well as federal proceedings.  Kiowa Tribe, 523 U.S. at 755.  The Band has filed a suit to enjoin state officials from interfering with its alleged federal right of tribal sovereign immunity.  Such an action would appear to satisfy the requirements of Verizon Maryland and Local Union No. 12004.  See Kiowa Indian Tribe v. Hoover, 150 F.3d 1163, 1171-72 (10th Cir. 1998) (reversing district court's denial of tribe's motion for preliminary injunction against enforcement of state court judgments on the grounds of tribal sovereign immunity).

Maine argues, however, that tribal sovereign immunity cannot be asserted in an Ex parte Young action.  Its principal authority for this argument is Graham, in which the Supreme Court held that a tribe, sued in state court by the state, may not remove to federal court on the basis of tribal sovereign immunity because "a federal immunity to the claims asserted does not convert a suit otherwise arising under state law into one which, in the statutory sense, arises under federal law."  489 U.S. at 841.  In Maine's view, Graham stands for the proposition that "a tribal sovereign immunity defense . . . cannot form the basis of 'arising under' jurisdiction."  But Maine fails to recognize that Count II pleads a tribal sovereignty offense.  As described above, there is a

enforcement of the MHRA and the MWPA against the Band."

crucial difference between removal of a state claim and an Ex parte Young action. See supra Part IV.A.2. The well-pleaded complaint rule applies to the plaintiff's complaint, regardless of whether it was filed in state court or federal court. See Rossello-Gonzalez, 398 F.3d at 10 (applying rule to complaint filed in state court). The well-pleaded complaint in Graham contained an Oklahoma law tax claim; the well-pleaded complaint here contains a claim under a federal cause of action asserting a federal common law right. Graham addressed whether a defendant may remove on the basis of a tribal sovereign immunity defense; it simply does not apply where a plaintiff pleads an Ex parte Young action on the basis of the federal right of tribal sovereign immunity.

Again, a key flaw in Maine's analysis is its assumption that tribal sovereign immunity is only a defense to a lawsuit, and since the Commission has not filed (or threatened to file) suit against the Band, considerations of tribal sovereign immunity are premature. But tribal sovereign immunity might apply to the Commission's investigations themselves.[33] We do not hold that tribal sovereign immunity applies to such proceedings, nor even that the Band actually retains tribal sovereign immunity in light of MICSA and the Federal Micmac Settlement Act. See supra note 19. We simply conclude that the Band's claim of tribal sovereign immunity presents a "colorable" claim of a federal cause of action

_____

[33]As an analogy, state sovereign immunity applies to certain federal administrative proceedings. See S.C. State Ports Auth., 535 U.S. at 760-61.

-41-

under <u>Ex parte Young</u>.  Consequently, the district court erred in dismissing Count II for lack of subject-matter jurisdiction.[34]

**V.**

Counts III and IV relate to a provision in the Civil Rights Act of 1964 stating that Indian tribes are not "employers" under Title VII.  <u>See</u> 42 U.S.C. § 2000e(b).  Count III seeks a declaration that the Band is not subject to Title VII, and an injunction against the Commission from applying Title VII to the Band and filing charges against the Band with the federal EEOC.  Count IV alleges that the Title VII exemption preempts contrary state law, and seeks declaratory and injunctive relief that the Commission may not apply the MHRA and MWPA against the Band.  In other words, Count III claims that the Band is exempt from Title VII, while Count IV says that <u>because</u> the Band is exempt from Title VII, it must be exempt, as a matter of federal law, from the MHRA and MWPA too. The district court dismissed both counts on the grounds that they did not pose justiciable cases or controversies. <u>See</u> <u>Micmacs</u>, 307 F. Supp. 2d at 106-08.  We disagree.

**A.        Count III (Title VII Exemption)**

Until recently, Commission staff would apparently, as a matter of course under the agencies' "dual filing" procedure,[35]

---

[34]Again, we need not decide whether § 1362 would apply.  <u>See</u> <u>supra</u> note 31.

[35]"Dual filing" refers to the practice by which a complainant may file a charge with a state antidiscrimination agency alleging violations of both state and federal law.  The state agency then files a charge with the EEOC on the complainant's behalf, but processes the complaint itself first.  <u>See</u> 42 U.S.C. §§ 2000e-5(b)-(e) (describing how dual filed charges are treated for purposes of determining whether reasonable cause exists, time for filing

automatically file EEOC complaints against the Band on behalf of Commission complainants and let the EEOC decide whether Title VII applied.  This practice has apparently stopped, and the Commission admitted in its answer that Title VII does not apply to the Band. Cf. Fellencer, 164 F.3d at 712 (Title VII exemption applies to Penobscot Nation); Boudman v. Aroostook Band of Micmac Indians, 54 F. Supp. 2d 44, 48-49 (D. Me. 1999) (same for the Band).  The Commission's current position is that it "does not file discrimination charges against tribes with the EEOC unless the [Commission] has some reason for believing that Title VII might somehow apply."

Maine argues that there is no justiciable case or controversy because there is no dispute: all parties agree that the Band is exempt from Title VII, and hence there is nothing for a court to resolve.  The district court apparently agreed.  See Micmacs, 307 F. Supp. 2d at 107.  While the district court did not identify which branch of case or controversy doctrine supported its ruling, we understand it to have meant the dispute was moot.

The dispute is not moot because nothing prevents the Commission from resuming its former practice.  "[V]oluntary cessation of allegedly illegal conduct . . . does not make the case moot."  United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953). The reason is simple: "The defendant is free to return to his old ways."  Id.  Voluntary cessation will only moot a dispute when "(1) it can be said with assurance that 'there is no reasonable

charges, and other purposes).

-43-

expectation . . .' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  Los Angeles County v. Davis, 440 U.S. 625, 631 (1979) (citations omitted; alteration in original).  The defendant's burden of establishing mootness "is a heavy one," W.T. Grant, 345 U.S. at 633, and it must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968).

The Commission has not met that burden.  First, the record indicates that the Commission referred four different complaints to the EEOC after the United States District Court for the District of Maine held in Boudman that the Band is exempt from Title VII.[36]  Second, even the Commission's concession is qualified. It reserves the right to file EEOC charges against the Band if it "has some reason for believing that Title VII might somehow apply." For these reasons, the Commission has not adequately demonstrated that its voluntary cessation is permanent.

The district court advanced a second reason why Count III does not present a case or controversy:  Even if the Commission were still referring charges against the Band to the EEOC, "such act would have no possible operative effect under the law" because the Band is, in fact, exempt under Boudman.  Micmacs, 307 F. Supp. 2d at 107.  We read this as finding that the complaint does not allege an injury-in-fact for standing purposes.  In other words,

_____

[36]To be fair, the Commission was not a party in Boudman.

-44-

even if the Commission erroneously files an EEOC charge against the Band, such referral causes no cognizable injury.  See generally Steir v. Girl Scouts of the USA, 383 F.3d 7, 14-15 (1st Cir. 2004) (summarizing Article III injury-in-fact requirement).

We disagree.  As a general rule, "[w]hen the suit is one challenging the legality of government action . . . [and] the plaintiff is himself an object of the action . . . . there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62 (1992).  The Band alleges two specific injuries from the Commission's filing of charges with the EEOC.  First, the Band asserts dignitary harm: it is forced to defend itself to the EEOC when, it claims, Congress has shielded the Band from such investigations entirely.  As the Band notes, if "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing," id. at 562-63, then repeated filing of arguably frivolous federal charges against an Indian tribe that Congress has expressly exempted from the law's reach also causes a cognizable injury.  Similarly, if the loss of the right to litigate in the forum of one's choice is cognizable, see Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 77 (1991), superseded by statute on other grounds as stated in Parker v. Della Rocco, 252 F.3d 663, 666 n.2 (2d Cir. 2001), then so too is being forced to litigate in a forum where one is not required to appear at all.

-45-

Second, the Band asserts economic harm: it must respond to the charge and pay attorneys to argue that it is exempt. Even assuming that the EEOC immediately agrees with the Band and dismisses each case, repeatedly forcing the Band to defend obviously futile Title VII complaints makes it incur financial costs that qualify as a cognizable injury. Cf. P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144-45 (1993) (holding that denial of motion to dismiss on Eleventh Amendment grounds is immediately appealable under collateral order rule, and explaining that "the value to the States of their Eleventh Amendment immunity . . . is for the most part lost as litigation proceeds past motion practice").

Because the Band had standing to raise Count III and that claim was not rendered moot by the Commission's voluntary cessation of its conduct, the district court erred in dismissing Count III for lack of subject matter jurisdiction.

**B.      Count IV (Title VII Preemption)**

Count IV alleges that Title VII preempts the MHRA and MWPA to the extent that those laws include the Band within their respective definitions of "employer." The district court stated that it "consider[ed] the question settled as to the Maine tribes" and cited Shannon v. Houlton Band of Maliseet Indians, 54 F. Supp. 2d 35, 40 (D. Me. 1999), for the proposition that the Title VII exemption does not preempt state law as to the Maliseets. Micmacs, 307 F. Supp. 2d at 107; see also Fellencer, 164 F.3d at 711 n.3 (the idea that "the Title VII exemption operated to preempt state

-46-

law <u>with respect to the Maliseet Indians</u> . . . was clearly not intended by the [MICSA]").[37]

However, after a brief discussion of the merits (and why the rule of <u>Shannon</u> applies to the Band), the district court ultimately concluded that "Count IV does not raise a case or controversy." <u>Micmacs</u>, 307 F. Supp. 2d at 108. That analysis is incorrect. The fact that the Band's position might be difficult to maintain because another district court has already answered the legal question in the state's favor does not mean that there is no case or controversy. Plaintiffs are free to bring cases that fly in the face of precedent. When they do so, however, those cases should be resolved on the legal or factual merits, not dismissed for lack of a case or controversy. "Courts should not . . . conflate the constitutional standing inquiry with the merits determination that comes later." <u>United States</u> v. <u>One-Sixth Share</u>, 326 F.3d 36, 41 (1st Cir. 2003).[38]

**VI.**

---

[37]While the Band arguably stands in a different legal position than the Maliseets in some respects, we understand the district court to have meant that, whatever the differences between those two tribes, the impact of the Title VII exemption would be identical.

[38]Although the Band's position on this point may be foreclosed by <u>Fellencer</u>, 164 F.3d at 711 n.3, and we have the discretion to affirm the district court's dismissal on any basis supported by the record, <u>Willhauck</u> v. <u>Halpin</u>, 953 F.2d 689, 704 (1st Cir. 1991), we decline to exercise that discretion here. Because of the district court's disposition, the Band understandably devoted its arguments on appeal to the question of justiciability. Consequently, we will not pretermit the Band's case by deciding the merits before the district court has done so.

-47-

One might argue (though Maine did not) that, even if the district court has jurisdiction over Counts I-IV, it should nevertheless abstain from exercising that jurisdiction. Under the doctrine of <u>Railroad Commission of Texas</u> v. <u>Pullman Co.</u>, 312 U.S. 496 (1941), a federal court may abstain when a "federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law." <u>Harris County Comm'rs Court</u> v. <u>Moore</u>, 420 U.S. 77, 84 (1975). In such circumstances, a federal court "should stay its hand in order to provide the state courts an opportunity to settle the underlying state-law question and thus avoid the possibility of unnecessarily deciding a constitutional question." <u>Id.</u> at 83. Here, litigation in state court might lead to a holding that the Band is not an "employer" under the MHRA and MWPA, and thus eliminate the need to resolve the federal claims in this case.

Even assuming <u>arguendo</u> that abstention is proper when the only constitutional issue in the case is preemption,[39] abstention is inappropriate here. Since the principal federal issue is whether the Band is subject to state law and required to submit to the jurisdiction of state tribunals (whether administrative or judicial) <u>at all</u>, requiring the Band to first try its hand in state proceedings would be perverse. <u>Cf.</u> <u>Miller-Davis Co.</u> v. <u>Ill. State Toll Highway Auth.</u>, 567 F.2d 323, 325-27 (7th Cir. 1977) (district

[39]<u>Compare, e.g.,</u> <u>Fireman's Fund Ins. Co.</u> v. <u>City of Lodi</u>, 302 F.3d 928, 939 n.12 (9th Cir. 2002) (holding that "<u>Pullman</u> abstention is not appropriate when the federal question at stake is one of federal preemption") <u>with</u> <u>Fleet Bank, N.A.</u> v. <u>Burke</u>, 160 F.3d 883, 890-93 (2d Cir. 1998) (holding the opposite).

court erred in abstaining from deciding state agency's Eleventh Amendment defense so that state court could decide whether agency had waived immunity as a matter of state law).  For the Band to argue that it is not an "employer" under the MHRA and MWPA, it must first submit to the jurisdiction of the state court.  That is precisely what it does not wish to do, and it has come to federal court explicitly seeking a ruling that it need not defend itself in state court.  Since the Band has asserted a dignitary harm in being forced to defend itself before the Commission, let alone Maine courts, abstention would be tantamount to a decision on the merits against the Band.

**VII.**

One final matter remains.  Besides the Commission defendants, the Band also sued Gardiner, Condon, and Ayoob, the former employees who charged the Band with discrimination.  The complaint does not allege any unlawful activity by the individual defendants, nor pray for relief against them.[40]  On appeal, the Band concedes that it seeks no injunctive relief against the individual defendants, and confines its argument to the Commission defendants. We assume that the individual defendants were joined as persons needed for just adjudication pursuant to Fed. R. Civ. P. 19(a)(2), because they have an interest in the action and, arguably, their ability to protect that interest would be impaired without their participation.  We express no view on this subject, but, given our

---

[40]Indeed, the Ex parte Young cause of action upon which the complaint depends would not be available against the individual defendants.  See Penobscot Nation I, 106 F. Supp. 2d at 83 n.4.

disposition of the rest of the case, vacate the dismissal of the complaint as against the individual defendants for reconsideration on remand.[41]

With the exception of Count V, which the Band apparently concedes is purely a state law claim, the Band is entitled to make its case, and receive a determination on the merits, in federal court. Because it dismissed the entire action, the district court did not consider whether to exercise supplemental jurisdiction over Count V under 28 U.S.C. § 1367. We express no view regarding whether, on remand, it should do so, nor whether, in making that decision, the court should consider the possibility of certifying the state law question to the Maine Supreme Judicial Court. See Me. R. App. P. 25.

**VIII.**

As to the individual defendants, we **vacate** the dismissal of all claims. As to the Commission defendants, we **reverse** the dismissal of Counts I, II, III, and IV for lack of subject matter jurisdiction, **vacate** the dismissal of Count V, and **remand** for further proceedings consistent with this opinion.

---

[41]If the district court determines that the individual defendants need not (or cannot) be joined pursuant to Fed. R. Civ. P. 19(a), and decides again to dismiss the complaint as to them, the court should also consider any timely application by those individuals to intervene under Fed. R. Civ. P. 24.

-50-