LIPEZ, Circuit Judge.
 

 This case requires us to revisit and further define the allocation of sovereign powers between the Penobscot Nation (the Nation) and the State of Maine. The question before us is whether the decision of the Penobscot Nation Tribal Council to terminate the employment of a community health nurse constitutes an “internal tribal matter” within the meaning of the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. §§ 1721 -1735. The district court held that it does not. We disagree. That employment termination decision is an “internal tribal matter” and, as such, cannot be challenged in the courts of Maine pursuant to the Maine Human Rights Act (MHRA), Me.Rev.Stat. Ann. tit. 5, § 4551 et seq.
 

 I.
 

 The undisputed material facts are recounted thoroughly in the district court’s opinion.
 
 See Penobscot Nation v. Fellencer,
 
 999 F.Supp. 120 (D.Me.1998). We provide only a brief sketch to set the stage. Cynthia A. Fellencer was employed by the Penobscot Nation as a Community Health Nurse/Diabetes Program Coordinator (community nurse) from December 1992 until September 1994, when the Penobscot Nation Tribal Council voted to terminate her employment. Fel-lencer, who is a non-Indian, filed a charge of discrimination with the Maine Human Rights Commission (MHRC) alleging that she had been discharged due to her race and national origin. The MHRC dismissed her complaint for' lack of jurisdiction, finding that adjudication of the claim “would create a serious potential of State interference with the internal affair's of the tribal government, a result clearly not intended by the Maine Indian Settlement Act.” MHRC Administrative Dismissal, Case No. E94-0730 (Jan. 30, 1995).
 

 Fellencer subsequently filed suit in the Maine Superior Court against the Penobscot Nation, claiming that the Nation had terminated her1 employment (1) without due process and (2) “due to her- race and/or' national origin in violation of the Maine Human Rights Act.” She claims that subsequent to her' termination the community nurse position was posted with an express preference for Indian applicants. The Nation filed a motion to dismiss, which was denied.
 

 On October 20, 1997, the Nation filed the instant action in the federal district court seeking a preliminary injunction to stay the state court proceeding. Cross motions for summary judgment were filed. On March 13, 1998, the distract court denied the Nation’s request for a preliminary injunction and entered judgment in favor of Fellencer, thereby permitting the state court case to proceed. The district court’s denial of the preliminary injunction can be reversed where there has been a “misapplication of the law to particular facts” or an “application of the wrong legal standard.”
 
 See Planned Parenthood League of Mass. v. Bellotti,
 
 641 F.2d 1006, 1009 (1st Cir.1981);
 
 see also Narragansett Indian Tribe v. Narragansett Elec. Co.,
 
 89 F.3d 908, 912 (1st Cir.1996) (reversing district court’s denial of preliminary injunction). We conclude that there was a misapplication of the law.
 

 II.
 

 The backdrop to the state and federal court proceedings is some familiar history. In the early 1970s, the Nation (in concert with the Passamaquoddy Tribe and others) filed suit claiming nearly two-thirds of Maine’s land mass as their ancestral homelands.
 
 See Passamaquoddy Tribe v. Maine,
 
 75 F.3d 784, 787 (1st Cir.1996) (citing
 
 Joint Tribal Council of the Passamaquoddy Tribe v. Morion,
 
 528 F.2d 370 (1st Cir.1975)). After' federal authorities interceded, the parties negotiated a compromise which was ap
 
 *708
 
 proved by Maine, the Penobscots, the other Indian parties, and Congress. The compromise is memorialized in two statutes: the Maine Implementing Act, Me.Rev.Stat. Ann. tit. 30, §§ 6201-14 (the Implementing Act), and the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721-35 (the Settlement Act). The settlement represented a partial victory for the Nation and Maine: the Nation obtained federal recognition as an Indian tribe and received almost one half of $81.5 million appropriated under the Settlement Act (see 25 U.S.C. § 1733) and, in exchange, the Nation’s claims against Maine were extinguished. Further, while the Nation’s right to self-government was preserved to a limited extent, Maine was permitted to extend its jurisdiction over the Nation to a greater degree than most states exercise over' other Indian tribes.
 
 See Akins v. Penobscot Nation,
 
 130 F.3d 482, 484-85 (1st Cir.1997).
 

 As a result of the settlement, the relationship between the Penobscot Nation and Maine is governed primarily by the Implementing Act (state) and the Settlement Act (federal). The Implementing Act provides as follows:
 

 [T]he Passamaquoddy Tribe and the Pe-nobscot Nation, within their respective In-dian territories, shall have, exercise and enjoy all the rights, privileges, powers and immunities, including, but without limitation, the power to enact ordinances and collect taxes, and shall be subject to all the duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State,
 
 provided, however, that internal tribal matters,
 
 including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income
 
 shall not be subject to regulation by the State.
 

 Me.Rev.Stat. Ann. tit. 30, § 6206(1) (emphasis added). We have previously recognized that “[a]s to state law, the Penobscot Nation and Maine expressly agreed that, with very limited exceptions, the Nation is subject to the laws of Maine.”
 
 Akins,
 
 130 F.3d at 484-85.
 

 The Implementing Act was
 
 incorporated
 
 by reference into the Settlement Act, 25 Ú.S.C. §§ 1721-1735.
 
 See
 
 25 U.S.C. § 1721(b)(3). In ratifying the Implementing Act, Congress sought to balance Maine’s interest in continuing to exercise jurisdiction over the Nation’s land and members (which it had done without interference for' almost two centuries),
 
 see Bottomly v. Passamaquoddy Tribe,
 
 599 F.2d 1061, 1064-65 (1st Cir.1979), with the Nation’s “independent source of tribal authority, that is, the inherent authority of a tribe to be self-governing.” S.Rep. No. 96-957, at 29 (1980) (citing
 
 Santa Clara. Pueblo v. Martinez,
 
 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)). Both the House and Senate sought to assuage the Nation’s fears that the settlement undermined its sovereignty:
 

 While the settlement represents a compromise in which state authority is extended over Indian territory to the extent provided in the Maine Implementing Act, ... the settlement provides that henceforth the tribes will be free from state interference in the exercise of their internal affairs. Thus, rather than destroying the sovereignty of the tribes, by recognizing their power to control their- internal affairs ... the settlement strengthens the sovereignty of the Maine Tribes.
 

 S. Rep. No. 96-957, at 14; H.R.Rep. No. 96-1353, at 14-15,
 
 reprinted in
 
 1980 U.S.C.C.A.N. at 3790.
 

 III.
 

 As the language of the Implementing Act and the federal legislative history make clear, the critical phrase to analyze in determining the scope of tribal sovereignty is “internal tribal matter's.” When the Nation acts on “internal tribal matters,” its actions are not subject to regulation by the state. Me.Rev.Stat. Ann. tit. 30, § 6206(1). Because the phrase “internal tribal matters” was adopted by the federal Settlement Act, the meaning of that phrase raises a question of federal law.
 
 See Akins,
 
 130 F.3d at 485;
 
 see also Bottomly,
 
 599 F.2d at 1066 (“until Congress acts, the tribes retain their [ ] sovereign powers”).
 

 
 *709
 
 Before we examine the language of the Implementing Act, we must acknowledge some general principles that inform our analysis of the statutory language. First, Congress’ authority to legislate over Indian affairs is plenary and only Congress can abrogate or limit an Indian tribe’s sovereignty. See U.S. CONST., art. I, § 8, cl. 3;
 
 Motion v. Mancari,
 
 417 U.S. 535, 551-53, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (discussing the plenary power of Congress to deal with special problems of Indians); see
 
 also
 
 F. Cohen,
 
 Handbook of Federal Indian Law
 
 231 (1982 ed.) (“Neither the passage of time nor apparent assimilation of the Indians can be interpreted as diminishing or abandoning a tribe’s status as a self governing entity.”). Second, special rules of statutory construction obligate us to construe “acts diminishing the sovereign rights of Indian tribes ... strictly,”
 
 Rhode Island v. Narragansett Indian Tribe,
 
 19 F.3d 685, 702 (1st Cir.1994), “with ambiguous provisions interpreted to the [Indians’] benefit,”
 
 County of Oneida v. Oneida Indian Nation of New York,
 
 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). These special canons of construction are employed “in order to comport with the[ ] traditional notions of sovereignty and with the federal policy of encouraging tribal independence,”
 
 White Mountain Apache Tribe v. Bracker,
 
 448 U.S. 136, 143-44, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), and are “rooted in the unique trust relationship between the United States and the Indians,”
 
 County of
 
 Oneida, 470 U.S. at 247, 105 S.Ct. 1245.
 

 A.
 
 The La nguage of the Statute
 

 The Implementing Act preserves the Nation’s sovereignty with respect to
 

 internal tribal matters, including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income....
 

 Me.Rev.Stat. Ann. tit. 30, § 6206(1). While the list of exemplars following “internal tribal matters” informs the meaning of that term, the list is not exclusive or exhaustive. In fact, we declared in
 
 Akins
 
 that the exemplars “provide limited guidance.”
 
 Akins,
 
 130 F.3d at 486. We also recognized in
 
 Akins
 
 that the fact “[t]hat a tribe attempts to govern a matter does not render it an internal tribal matter.”
 
 Id.
 

 B.
 
 The Akins Precedent
 

 Akins
 
 was our first occasion for addressing the allocation of sovereign powers between the Nation and the State of Maine pursuant to the Implementing Act and the Settlement Act. The Nation had adopted a policy allowing only enrolled members of the tribe who lived on the reservation to be eligible for timber permits to harvest timber on tribal lands.
 
 See Akins,
 
 130 F.3d at 483. Akins, an enrolled tribal member who had moved off the reservation, lost his timber permit as a result of the change in policy.
 
 Id.
 
 at 483-84. Akins sued in federal court, claiming that the Nation had violated his rights to due process and equal protection, and that the Nation had violated his right to be free from bills of attainder.
 
 Id.
 
 at 484. We held that Akins’ claims involved an “internal tribal matter'” and were subject to the exclusive jurisdiction of the tribal courts.
 
 Id.
 
 at 490.
 

 We identified five considerations in
 
 Akins
 
 that were persuasive in characterizing the grant of timber rights as an “internal tribal matter.” These considerations were: (1) the disputed policy regulated only tribal members; (2) the policy related to lands acquired by the Nation with federal funds received for that purpose, and the lands were considered “Penobscot Indian Territory”; (3) the policy affected the Nation’s ability to regulate its natural resources; (4) at least on its face, the policy did not implicate or' impair' the interest of the State of Maine; and (5) the recognition that the timber harvesting policy involved an “internal tribal matter” was consistent with prior legal understandings.
 
 Akins,
 
 130 F.3d at 486-87. We did not offer these considerations as an essential test for determining which tribal actions constitute “internal tribal matters,”
 
 see id.
 
 at 487 (noting that “generalizations in this subject [of tribal authority] have become . .. treacherous” and that “[w]e tread cautiously and write narrowly”), and we do not offer them now for that purpose. Instead, we use the
 
 Akins
 
 considerations as one source of guidance in resolving this case.
 
 *710
 
 And, in the spirit of
 
 Akim,
 
 we consider another pertinent factor, the nature of the position involved in this case.
 

 Evaluating all of these considerations, with particular emphasis on the interest of the State of Maine, prior legal understandings, and the nature of Fellencer’s position, we conclude that the decision of the Nation to terminate Fellencer’s employment was an “internal tribal matter.”
 

 C.
 
 The Akins Considerations
 

 1. Within the Tribe
 

 Although Fellencer, unlike Akins, is not a member of the Nation, and hence the effect of the decision at issue is not limited to tribal members, the decision to terminate Fellencer as the community health nurse affects many tribal members but only one non-tribal member (Fellencer). This limited impact beyond the Nation distinguishes this case from
 
 Penobscot Nation v. Stilphen,
 
 461 A.2d 478 (Me.1983), wherein the Maine Supreme Judicial Court held that a “beano” game, a tribal enterprise designed to involve many non-tribal members, did not become an “internal tribal matter” simply because an Indian tribe administered it, or because an Indian tribe funded government services with the beano game’s profits.
 
 See id,
 
 at 486. Holding that the public gambling events were “related to tribal self-government only because of the use to which its profits are put,” the
 
 Stilphen
 
 Court held that the tribe had “no inherent right to ‘market an exemption from state taxation’ ” to the public,
 
 id,
 
 (quoting
 
 Washington v. Confederated Tribes of the Colville Indian Reservation,
 
 447 U.S. 134, 156, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)). The “beano” games in
 
 Stilphen
 
 were designed to “draw many hundreds of players to the Penobscot reservation from all over Maine and beyond.”
 
 Stilphen
 
 461 A.2d at 480. Here the employment decision has its immediate effect on only one non-tribal member.
 
 [1]
 

 2 & 3. Land and, Natural Resources
 

 The second and third considerations in
 
 Akins
 
 related to the commercial use of tribal lands (“the very land that defines the territory of the Nation,”
 
 Akins,
 
 130 F.3d at 487), and the “growth, health, and reaping” of the tribe’s natural resources.
 
 Id.
 
 Although this case does not involve tribal land and natural resources, it does involve the Nation’s human resources and its judgment that a different community health nurse will better serve the health of tribal members.
 
 See Montana v. United States,
 
 450 U.S. 544, 566, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (recognizing that Indian tribes may “retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the ... health or welfare of the tribe”).
 

 J.
 
 Interest of Maine
 

 As a generality, Maine has a strong interest in protecting all employees against discrimination through its Human Rights Act.
 
 See
 
 Me.Rev.Stat. Ann. tit. 5, § 4552;
 
 see also Maine Human Rights Comm’n v. Local 1361, United Paperworkers Int'l
 
 Union, 383 A.2d 369, 373 (Me.1978)(stating that the MHRA “was meant to have very broad coverage”). In this case, however, the State is not attempting to apply its laws to the Nation’s employment decision. To the contrary, the Maine Attorney General ruled long before this case that “the employment decisions of the Penobscot Nation, when acting in its capacity as a tribal governmental employer', are not subject to regulation by the state[.]” Maine Attorney General Opinion No. 84-22 (July 25, 1984).
 
 [2]
 
 Thus, while the United States intervened in this case to argue that an employment decision by the Nation is an
 
 *711
 
 “internal tribal matter” and therefore not subject to the MHRA, Maine did not intervene to argue to the contrary. In
 
 Akins
 
 we found this posture significant. Even though Akins alleged violations of Maine law, we noted that there was
 
 “not a dispute between Maine and. the Nation
 
 over the attempted enforcement of Maine’s laws.”
 
 Akins,
 
 130 F.3d at 487 (emphasis added). The situation here is even more favorable to the Nation. The state disavows the very “state interest” that Fellencer seeks to invoke in support of her private cause of action.
 

 5. Prior Legal Understandings
 

 Prior legal understandings strongly support the Nation’s claim of exemption from challenge in state court to its employment termination decision. In the employment discrimination context, Congress exempted Indian tribes from Title VII’s definition of “employer” in the original passage of the Civil Rights Act of Ih64. 42 U.S.C. § 2000e(b) (“[T]he term ‘employer’ means a person engaged in an industry affecting commerce .... Such term does not include ... an Indian tribe”).
 
 [3]
 
 The Supreme Court has characterized this exemption as “Congress’ recognition of the longstanding federal policy of providing a unique legal status to the Indians in matters of tribal employment,” and it characterized Congressional intent as a
 
 “policy of furthering Indian self-government.” Morton v. Mancari,
 
 417 U.S. 535, 548, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (emphasis added).
 
 [4]
 

 General federal Indian civil rights law, outside the employment discrimination context, further bolsters the conclusion that Fellencer’s claim involves an “internal tribal matter.” Even though Indian tribes were exempted from Title VII coverage, Congress subsequently enacted the Indian Civil Rights Act of 1968 (ICRA), 25 U.S.C. §§ 1301-41, made applicable to the Penobscot Nation through the Settlement Act, 25 U.S.C. § 1725(h).
 
 See Akins,
 
 130 F.3d at 486. Under the ICRA, “[n]o Indian tribe in exercising powers of self-government shall . .. deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law.” 25 U.S.C. § 1302(8).
 

 As fundamental as federal court jurisdiction has been to the protection of the civil lights enumerated in section 1302(8), the Supreme Court held in
 
 Santa Clara Pueblo v. Martinez,
 
 436 U.S. 49, 65, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) that gender discrimination claims against tribes were cognizable only in Indian tribunals.
 
 [5]
 
 In the Supreme Court’s view, Congress did not intend to abrogate Indian tribal sovereignty to the extent that Indian tribes could be forced to defend against such civil rights claims in an external (non-tribal) forum: “Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and
 
 *712
 
 property interests of both Indians and non-Indians.”
 
 Id.
 
 The Supreme Court explained that exclusive jurisdiction has been reposed in the Indian tribunals because subjecting such claims to federal court jurisdiction “plainly would be at odds with the congressional goal of protecting tribal self-government.”
 
 Id.
 
 at 64, 98 S.Ct. 1670.
 
 [6]
 

 These prior legal understandings (both the Title VII exemption and the ICRA’s grant of exclusive jurisdiction to tribal courts) are particularly important because they inform the intent of Congress in the adoption of the Settlement Act. We “have long presumed that Congress acts against the background of prior law.”
 
 Akins,
 
 130 F.3d at 489 (citing
 
 Kolster v. INS,
 
 101 F.3d 785, 787-88 (1st Cir.1996));
 
 see also Passamaquoddy Tribe,
 
 75 F.3d at 789 (“To [give effect to the legislative will] a court must take into account the tacit assumptions that underlie a legislative enactment, including not only general policies but also preexisting statutory provisions.”). The statutory provisions in Title VII and the ICRA reflect Congress’ understanding prior to the adoption of the Settlement Act that employment discrimination claims against Indian tribes implicate “unique” considerations,
 
 see Morton v. Mancari,
 
 417 U.S. at 548, 94 S.Ct. 2474, and that such claims should be heard in Indian courts.
 
 See Santa Clara, Pueblo,
 
 436 U.S. at 64-65, 98 S.Ct. 1670.
 

 Indeed, the Senate Report on the Settlement Act explicitly cited with approval to
 
 Santa Clara Pueblo v. Martinez,
 
 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).
 
 See
 
 S.Rep. No. 96-957, at 29 (1980). Although we have refused to read into this reference an incorporation of “all prior Indian law” because that “would be inconsistent with the unique nature of the Maine settlement,” Akins, 130 F.3d at 489, we also recognized that Congress “explicitly made existing general federal Indian law applicable to the Pe-nobscot Nation in the Settlement Act.” Id. That body of law includes Congressional enactments excluding Indian tribes from Title VII coverage and limiting civil rights claims against the tribes to tribal forums. See
 
 Santa Clara, Pueblo,
 
 436 U.S. at 65-66, 98 S.Ct. 1670.
 

 The Senate Report on the Settlement Act also noted that the Act strengthened the Nation’s sovereignty “by recognizing [the Pe-nobscot’s] power to control their internal affairs and by withdrawing the power which Maine previously claimed to interfere in such matters!.]” S. Rep. 96-957, at 14. The Report predicates the Nation’s right to be free from state interference on the Nation’s “inherent sovereignty” as recognized in
 
 Bottomly,
 
 599 F.2d at 1061, and
 
 State v. Dana,
 
 404 A.2d 551 (Me.1979). Both
 
 Bottornly
 
 and
 
 Dana,
 
 drew on federal Indian common law in recognizing the inherent sovereignty of the Penobscot and Passamaquoddy tribes.
 
 See Bottornly,
 
 599 F.2d at 1066;
 
 Dana,
 
 404 A.2d at 560-61. The Report states that “[i]n keeping with” the sovereignty recognized in
 
 Bottornly
 
 and Dana, it was Congress’ intent to
 
 guarantee
 
 that the Nation “[would] be free from state interference in the exercise of [its] internal affairs.” S. Rep. 96-957 at 14. By characterizing its recognition of the Nation’s sovereignty as “in keeping with”
 
 Bottornly
 
 and
 
 Dana,
 
 Congress signaled its intent that federal Indian common law' give meaning to the terms of the settlement. The Senate Report continues by listing important sovereignty rights retained by the Nation, including “the establishment of tribal courts ... with powers similar to those exercised by Indian courts in other parts of the country.”
 
 Id.
 
 at 15. These powers included hearing employment discrimination claims filed against the tribes.
 

 In summary, these prior legal understandings provide strong support for classifying a claim of national origin discrimination based on the termination of Fellencer’s employment as an “internal tribal matter.”
 

 D.
 
 The Nature of the Posit ion at. Issue
 

 Apart from the statutory language, judicial precedent, legislative history and federal In-dian common law, the Nation’s employment of a community health nurse has particular “internal tribal matter” implications because
 
 *713
 
 of the statutory origins of the position. The community nurse position from which Fel-lencer was dismissed is funded by the Indian Self-Determination and Education Assistance Act of 1975 (ISDA), 25 U.S.C. § 450 et seq. Congress therein declared its policy to “respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of ... Federal services to Indian communities.” 25 U.S.C. § 450a(a);
 
 see also
 
 S.Rep. No. 102-392, at 7 (1992),
 
 reprinted in
 
 1992 U.S.C.C.A.N. at 3949 (1992 amendments to Indian Health Care Improvement Act)(“health care provided by people of one’s own culture is the most appropriate, and results in better utilization of health care services”). Believing that the administration of such sei-vices by Indians was “crucial to the realization of self-government,” 25 U.S.C. § 450(a)(1), Congress included an employment preference for Indians in the legislation. 25 U.S.C. § 450e(b) (requiring that “preferences and opportunities for training and employment . .. shall be given to Indians”).
 

 This employment preference for Indians distinguishes the Nation’s community nurse position from any position in a regular municipal government.
 
 Cf.
 
 Implementing Act, Me.Rev.Stat. Ann. tit. 30, § 6204 (subjecting Nation generally to same state jurisdiction as state exercises over municipalities). Clearly, Maine municipalities cannot employ similar preferences. The uniqueness of the federal employment preference counsels against the application of Maine law in this employment discrimination context. In light of the Supreme Court’s description of such preferences in
 
 Morton v. Mancan,
 
 417 U.S. at 553, 94 S.Ct. 2474 (1974), as furthering “self-government,” and in light of the other considerations set forth herein, we hold that the decision of the Nation to terminate the employment of a community health nurse was an “internal tribal matter” within the meaning of the Settlement Act, and hence the Nation cannot be subjected to state court jurisdiction for the adjudication of an employment discrimination claim pursuant to the Maine Human Rights Act.
 

 The judgment of the district court is
 
 reversed;
 
 the case is
 
 remanded
 
 for the entry of judgment in favor of the Nation and the issuance of an injunction if it is deemed necessaiy.
 

 [1]
 

 . We recognize that a decision exempting the Nation from coverage under the MHRA in this case may potentially affect other non-tribal members; i.e., non-members may be discouraged from applying for employment with the Nation. This broader public impact implicates the Slate of Maine’s responsibility for protecting its citizens from impermissible employment discrimination. We address this issue in our discussion of the interest of the State of Maine.
 

 [2]
 

 . This position was initially adopted by the MHRC in November 1982 in
 
 Ranco
 
 v.
 
 The Penobscot Nation
 
 (case No. E81-0020), and has been the undisturbed interpretation of the Maine Human Rights Commission since that time.
 

 [3]
 

 . The district court incorrectly expanded on the holding in
 
 Houlton Band of Maliseet Indians v. Maine Human Rights Commission,
 
 960 F.Supp. 449 (D.Me.1997) in determining that the Penob-scot Nation is not exempted from Title VII's coverage. The court in
 
 Houhon Baud
 
 was opining on whether the Title Vll exemption operated to preempt state law
 
 with respect to the Maliseet Indians,
 
 an outcome which was clearly not intended by the Settlement Act.
 
 See id.
 
 at 455;
 
 see also
 
 25 U.S.C. § 1725(h). However, as the
 
 Houl-ton Band
 
 court recognized, the "internal tribal matter" exemption applies to the Penobscot Nation and
 
 not
 
 to the Maliseet Indians.
 
 Houlton Band,
 
 960 F.Supp. at 454. Our decision is based on the "internal tribal matter” exemption and not on preemption
 
 perse.
 

 [4]
 

 . Two circuits have extended this exemption to bar claims against Indian tribes based on the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34, even though no similar express exemption is contained in the ADEA. These courts premised the implied exemption from federal court jurisdiction over age-based discrimination claims on the Indian tribes' right to self-government.
 
 See EEOC v. Fond du Lac Heavy Equip. and Const. Co.,
 
 986 F.2d 246, 249 (8th Cir.1993);
 
 EEOC v. Cherokee Nation,
 
 871 F.2d 937, 938 (10th Cir.1989).
 

 [5]
 

 .In
 
 Santa Clara Pueblo
 
 a female member of the tribe brought an action claiming the tribe’s policies violated the ICRA’s equal protection clause, 25 U.S.C. § 1302(8). Specifically, the plaintiff asserted that a tribal ordinance which denied tribal membership to the children of female members who marry outside the tribe but not to the children of similarly situated men impermis-sibly discriminated on the basis of gender.
 
 See Santa Clara Pueblo,
 
 436 U.S. at 52-53, 98 S.Ct. 1670.
 

 [6]
 

 . There is one exception, not applicable in this case: Congress has authorized federal court jurisdiction only to hear habeas corpus petitions.
 
 See
 
 25 U.S.C. § 1303;
 
 see also Santa Clara Pueblo,
 
 436 U.S. at 66-67, 98 S.Ct. 1670.