LIPEZ, Circuit Judge,
dissenting.
The majority considers at length whether the Maine Indian Claims Settlement Act (“MICSA”) authorizes the State to enforce its employment discrimination laws against the Aroostook Band of Micmacs and concludes that it does. In my view, however, MICSA no longer governs the relationship between the Band and the State. Instead, the federal Aroostook Band of Micmacs Settlement Act (“ABM-SA”) replaced MICSA in 1991 as the federal law governing the Band’s status, in- *65 eluding its relationship with the State of Maine.
I recognize that all relevant parties— Congress, the State and the Band — assumed that ABMSA’s passage would leave the Band subject to Maine law. ABMSA, however, relied solely on the State’s Micmac Settlement Act (“MSA”) to establish Maine’s jurisdiction over the Band.[30] That reliance makes the effectiveness of the state statute critical to the outcome of this case. I agree with the magistrate judge that, with at least one prerequisite unmet, MSA was never validly enacted, and the jurisdiction asserted by Maine and anticipated by Congress never took effect. Consequently, I conclude that the Band is not subject to the Maine employment discrimination laws at issue in this case. Respectfully, therefore, I dissent.
I.
The majority’s discussion of “The Status of the Aroostook Band under ABMSA” is devoted primarily to addressing, and rejecting, potential conflicts between MICSA and ABMSA. My colleagues specifically consider whether ABMSA’s provisions on federal recognition and self-government, §§ 6(a) and 7(a), conflict with, and thus exempt the Band from, the MICSA provision subjecting all Maine tribes to state law, 25 U.S.C. § 1725(a). Their discussion of potential conflicts is, however, beside the point because § 1725(a) no longer applies to the Micmacs. I agree with the Band that, except where otherwise stated in ABMSA, that act supplants MICSA with respect to the Micmacs’ status. ABMSA was enacted to replace MICSA on all matters for which the Band should have received individualized recognition in the earlier statute — as did the Passamaquod-dys, the Penobscots and the Maliseets. In effect, Congress retrieved the Micmacs from the MICSA catch-all provisions that applied to “all other tribes or bands of Indians” and, in a detailed and comprehensive enactment, defined the Micmacs’ new status as the fourth Maine tribe to be recognized and compensated for the loss of their aboriginal holdings.
I recognize the canon of statutory construction, cited by the majority, that two statutes capable of co-existence must both be regarded as effective, “absent a clearly expressed congressional intention to the contrary.” Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); see also United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 10 (1st Cir.2005) (“Inconsistency between ... two statutes ... is not enough: ‘where two seemingly inconsistent acts can reasonably stand together, a court must interpret them in a manner which gives harmonious operation and effect to both, in the absence of clear and unambiguous expression of Congressional intent to the contrary.’ ”) (citations omitted). The issue, however, is not whether the two statutes may co-exist — I agree that they may — but what effect ABMSA had on MICSA’s applicability to the Micmacs.
In my view, it is apparent that ABMSA replaces the general “all other tribes” approach of MICSA, as it may have applied to the Band, with a specific statute premised on federal recognition of the Band. In its coverage of subjects addressed in MIC-SA, this separate statutory settlement with the Micmacs parallels MICSA’s settlement with the other named tribes. In fact, Congress included language in ABMSA reflecting such an intent. In ABMSA’s *66 “Findings and policy” section, Congress observed that “[t]he Band was not referred to in [MICSA]” because its historical presence in Maine had not yet been documented, § 2(a)(2) (emphasis added), and further stated that “[i]t is now fair and just to afford the [Micmacs] the same settlement provided to the [Maliseets] ... to the extent they would have benefitted from inclusion in the Maine Indian Claims Settlement Act of 1980,” § 2(a)(5) (emphasis added). Congress thus enacted ABMSA because, after closer scrutiny of the Band’s history, lawmakers saw the need to redress the Band’s omission from MICSA as a federally recognized tribe.
Despite an expressed intent to afford the Band the same settlement as the Mali-seets, it is telling that Congress did not simply amend MICSA to extend like terms to the Micmacs. Rather, Congress specified in ABMSA’s provisions various entitlements for the Band, including a $900,000 land acquisition fund, see § 4(a), federal recognition, see § 6(a), and the right to “organize for its common welfare,” see § 7(a). ABMSA also contains provisions that parallel MICSA’s on the Band’s eligibility for financial benefits and for special services from the federal government. Compare ABMSA §§ 6(a), (c) with 25 U.S.C. § 1725(i).
In addition, as the majority acknowledges, ABMSA explicitly incorporated MICSA provisions governing the applicability of federal law, see § 6(b), and implementation of the Indian Child Welfare Act, see § 8.[31] If MICSA continued to apply to the Micmacs independently of such refer-enees in ABMSA, there would be no need for ABMSA to explicitly incorporate particular MICSA provisions. The majority offers an explanation for the overlap with respect to § 8 — observing that it clarifies the applicability of the Indian Child Welfare Act in Maine — but does not explain the need to adopt MICSA’s terms for the applicability of federal law in § 6(b). In my view, the reason for both is the same: where Congress wanted MICSA’s provisions to continue to apply to the Micmacs, it knew that it had to say so explicitly because ABMSA replaced MICSA with respect to the Band. Congress also took this approach with MICSA’s universal extin-guishment of claims of aboriginal title to Maine lands, explicitly recognizing that the Band remained bound by that portion of the earlier statute. See ABMSA § 2(a)(3) (noting that the Micmacs “could have asserted aboriginal title” to lands in Maine “but for the extinguishment of all such claims by the Maine Indian Claims Settlement Act of 1980”).
The specificity and completeness of ABMSA are persuasive evidence that the Act was clearly intended by Congress as a comparable, but independent, statement of the benefits and limitations applicable to the Band. The majority wrongly dismisses the Band’s argument that ABMSA’s reference to particular MICSA provisions, and not others, is significant, see supra pp. 41-42 (observing that the lack of reference to MICSA’s § 1725(a) — -the section imposing state jurisdiction on the tribes — is “easily explained” because ABMSA “clearly contemplates that the state Micmac Act will *67 have effect,” and the state act “contains language nearly identical to MICSA’s § 1725(a)”). That, of course, is precisely my point: in fully addressing the status of the Micmacs in ABMSA, Congress intended and expected that state jurisdiction over the Band would be accomplished by means of the state Micmac Act. Section 1725(a) was not mentioned because it was no longer pertinent; as with all other facets of the Micmacs’ status, Congress enacted a new, specific provision to govern the Band’s relationship with the State.
The majority misses the larger context when it briefly rejects the notion that ABMSA impliedly repealed § 1725(a). As my discussion shows, the issue here is not whether MICSA or any of its particular provisions were repealed through ABMSA. They were not. Rather, as the Band has argued, ABMSA simply rendered MICSA inapplicable to the Micmacs — except where specifically incorporated.[32] Moreover, even if we viewed this case from the perspective of implied repeal, the all-embracing nature of ABMSA would meet the standard to show Congressional intent to “repeal” MICSA insofar as it applied to the Micmacs. Cf. Posadas v. Nat’l City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936) (“[I]f the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act.”); Lahey Clinic Hosp., 399 F.3d at 10 (noting that implied repeal of a federal statute may be shown if, “by clear and manifest intent,” a later act “covers the whole subject matter area and was meant as a substitute”) (citing Kremer v. Chem. Constr. Corp., 456 U.S. 461, 468, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)); Granite State Chapter, Assoc. of Civilian Tehnicians v. Fed. Labor Relations Auth., 173 F.3d 25, 27 (1st Cir.1999) (“If one Congress clearly and manifestly makes known its intent to supplant an existing law, a court can find repeal by implication.”). That the progression from MICSA to ABMSA is from a general statute to a specific one lends additional support to the view that AMBSA effectively “repealed” MICSA with respect to the Band. Cf. Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) (noting the “strong presumption against repeals by implication, ... especially an implied repeal of a specific statute by a general one”) (citations omitted).
*68 Congress’s intention to replace MICSA with ABMSA for the Micmacs is evident in ABMSA’s approach to the issue of state jurisdiction over the Band. ABMSA neither invokes MICSA nor in its own terms subjects the Band to state law. Instead, it states as an express purpose the ratification of “the Micmac Settlement Act, which defines the relationship between the State of Maine and the Aroostook Band of Micmacs.” § 2(b)(4). By explicitly deferring to MSA on the issue of state jurisdiction without any reference to MICSA, ABMSA states, in effect, that MICSA is no longer the governing law on the Micmacs’ relationship with the State.[33]
The view of the majority that MICSA could be reactivated as a default, imposing state law on the Micmacs in the face of any statutory gap that may have occurred because of the failed enactment of MSA, might be more persuasive if MICSA and MSA contained identical jurisdictional provisions. In such circumstances, one could more plausibly argue that ABMSA was intended to reaffirm an ongoing relationship, first defined by MICSA. MIC-SA, however, included two separate provisions establishing the State’s authority over its resident tribes. See 25 U.S.C. § 1725(a), (d)(1). MSA did not include the second of these — the “sue and be sued” provision that typically is used to signify a waiver of immunity from suit. See, e.g., Gómez-Pérez v. Potter, 476 F.3d 54, 57 (1st Cir.2007). Whether or not that omission is significant on the question of sovereign immunity, it is a further indication that ABMSA was a distinct and independent enactment that replaced MICSA with respect to the Micmacs. To resurrect statutory provisions from MICSA when Congress in ABMSA effected (through attempted ratification of MSA) a different governing framework for the Band’s relationship with the State is unsupportable — and inconsistent with “a clearly expressed congressional intention to the contrary,” Morton, 417 U.S. at 551, 94 S.Ct. 2474.
My view that ABMSA replaced MICSA as the federal law governing the Band’s status and defining the Miemac-Maine relationship — and that MICSA therefore may not be invoked as a default — is reinforced by comments from every member of Maine’s Congressional delegation at the time of ABMSA’s passage. In urging a favorable vote on the statute, then-Senators Cohen and Mitchell and then-Representatives Andrews and Snowe all emphasized the need for the new legislation because of the Micmacs’ “omission from the 1980 Maine Indian Claims Settlement Act.” 137 Cong. Rec. H9,652, 9,655 (1991); see also 137 Cong. Rec. S13,360, 13,362 (1991). Among other comments, Senator Mitchell observed:
The Micmacs’ exclusion from the 1980 Maine Indian Claims Settlement Act left them in a unique situation, where they have no State Indian assistance and are ineligible for Federal assistance. The bill the Senate is considering today will establish the historical presence of the Micmacs in Maine and provide Federal recognition to the band.
137 Cong. Rec. at S13,362 (emphasis added).
Senator Cohen assured his colleagues that “[t]he bill does not amend the 1980 act, and we do not intend that any of the issues covered in that landmark legislation will be reopened or reconsidered.” 137 *69 Cong. Rec. at S13,362. In other words, Congress began with a clean slate in giving the Band-singularly excluded from MICSA-due recognition for its historical presence in Maine. To the extent that Congress wanted to draw on MICSA in drafting ABMSA, it cited the specific provisions of MICSA that it wished to incorporate into ABMSA.
ABMSA’s conflicts provision, § 11, reflects this approach. The provision states: “In the event of a conflict of interpretation between the provisions of the Maine Implementing Act, the Micmac Settlement Act, or the Maine Indian Claims Settlement Act of 1980 ... and this Act, the provisions of this Act shall govern.” MIC-SA remained in effect, and Congress undoubtedly recognized that the general language in MICSA and the more specific language in ABMSA covered some of the same subject matter. It thus sought to ensure that any seeming conflicts between the two would be resolved by deferring to ABMSA’s provisions — reinforcing ABM-SA’s preemptive effect on the matters it covered.[34]
In sum, every indicator points to a congressional intent to supplant MICSA for the Micmacs in all respects in which that earlier statute was not explicitly extended by ABMSA’s terms. Thus, I can only conclude that, after passage of ABMSA, MICSA no longer controlled Maine’s jurisdiction over the Aroostook Band of Micmacs.
II.
My conclusion that ABMSA, rather than MICSA, governs Maine’s authority to impose its employment discrimination laws on the Band requires me to evaluate the Maine Micmac Act. ABMSA relied wholly on the state act to “define[ ] the relationship between the State of Maine and the Aroostook Band of Micmacs,” § 2(b)(4), and I therefore must confront the Band’s *70 challenge to the validity of MSA. In a thoughtful and thorough discussion, the magistrate judge considered whether that statute may be deemed valid even though several statutory prerequisites to its effectiveness — including a requirement that it be certified by the Band within sixty days of the 1989 Legislature’s adjournment— were not met.[35] See Aroostook Band of Micmacs, 403 F.Supp.2d at 118-22. I agree with her assessment that it may not.[36]
The required certification cannot be cast aside as a mere technicality. Given the complex relationship between Maine and its tribes, it would be both injudicious and disrespectful to ignore an express requirement of consent contained in a settlement act.[37] Indeed, ABMSA and MSA carry the consent requirement through to future amendments regarding jurisdiction, see 30 Me.Rev.Stat. Ann. tit. 30, § 7201 (Historical and Statutory Note); AJBMSA § 6(d). Therefore, on this jurisdictional issue in particular, securing the Band’s formal agreement was deemed necessary.
As the magistrate judge pointed out, strict adherence to the consent procedure is consistent with a 1985 legal opinion from Maine’s Attorney General concerning a similar certification requirement in .the “Act Relating to the Time of Penobscot Nation Trust Land Acquisition.” That act required the Penobscot Nation to submit written certification of its agreement with the act’s provisions within sixty days of the legislature’s adjournment. The tribe’s certification was received two days late, and the Attorney General concluded that the only remedy was to reenact the legislation. He observed:
While this is unfortunate, I feel it is especially necessary to be strict in interpreting these provisions in that it deals with the question of land acquisition. Indeed, any other conclusion ... could render a land transaction subject to legal challenge by third parties.
Although MSA does not focus on the question of land acquisition, it is of comparable significance because the statute would diminish the Band’s sovereign rights. Cf., e.g., Penobscot Nation v. Fellencer, 164 F.3d 706, 709 (1st Cir.1999) (noting that courts are obliged “to construe ‘acts diminishing the sovereign rights of Indian tribes ... strictly’ ”) (quoting Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 702 (1st Cir.1994)). Moreover, the Legislature added the certification requirement to MSA in the face of the Attorney General’s previously issued opinion, *71 with the presumptive understanding that a failure to meet it could prevent the statute from taking effect. The formalities of legislative enactments often have substantive importance. In the context of Indian sovereignty, it would be particularly inappropriate to ignore an express statutory term protective of that sovereignty.
Indeed, while MSA’s efficacy is technically an issue governed by Maine law, the limitation it purportedly imposes on the Band’s sovereignty implicates federal concerns as well. States may not assert jurisdiction over tribes without congressional approval, see Three Affiliated Tribes of Fort Beythold Reserv. v. Wold Eng’g, 476 U.S. 877, 891, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986) (“[I]n the absence of federal authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States.”); Fellencer, 164 F.3d at 709 (“[OJnly Congress can abrogate or limit an Indian tribe’s sovereignty.”), and courts must remain sensitive to the federal interest even when sovereignty issues arise from state law. Noting that this is a “unique case and there is no controlling authority either way,” appellants urge the court to find implied certification based on the Band’s expressed support of MSA at the time of its enactment. On matters of Indian sovereignty, however, the magistrate judge is certainly correct that a court may not “finesse what is clearly the absence of a state legislative imposed precondition to the statute’s valid enactment.” 403 F.Supp.2d at 121.
Moreover, as with the issue of land acquisition, compliance with the certification requirement could have reduced the risk of time-consuming and expensive future conflicts. If the Band’s governing body had discussed and voted on the certification, tribal officials would have had the opportunity to crystallize their expectations and clarify matters of concern, and the Band’s formal commitment to the agreement would have protected the State from later claims that the Band objected to certain of its terms. Failure to obtain the Band’s consent was not, as appellants argue, simply an “irregularity in the final execution of the agreement.” To find implied consent would be to override the very purpose of a certification provision.
I also join the magistrate judge in rejecting the notion that Congress’s expression of purpose to ratify MSA effectively validated the statute — or served to incorporate its substantive provisions into federal law. Unlike MICSA, which affirmatively states that the tribes shall be “subject to the civil and criminal jurisdiction of the State,” 25 U.S.C. § 1725(a), or, in the case of the Passamaquoddy Tribe and Penobscot Nation, “subject to the jurisdiction of the State of Maine to the extent and in the manner provided in the Maine Implementing Act,” id. § (b)(1), ABMSA does not directly refer to the State’s jurisdiction. Instead, it defers to state law to “define[ ] the relationship between the State of Maine and the Aroostook Band of Micmacs.”[38] The silence in the federal statute, in light of Congress’s otherwise comprehensive treatment of the Band’s status, reflects a lack of affirmative intent on the issue. From all that appears, Congress was content in 1991 to leave the relationship between the Band and the State to Maine law. While Congress unquestionably anticipated a limitation on the Band’s sovereignty through MSA, it would be reading beyond the text to construe the purpose provision to mandate such a limitation. I see no basis for invigorating a state statutory enactment *72 that fails as a matter of state law, and which Congress has not replicated as a discrete statutory provision within ABM-SA.
It has now been nearly ten years since the certification problem surfaced, casting doubt on the validity of MSA and its assertion of state jurisdiction over the Band. In the well stated words of the magistrate judge: “There is no doubt that Congress did (and still does) have the power to enact federal legislation which, despite the lack of an effective state law, included the terms of that legislation in the federal aet[,] making those terms federal law.” 403 F.Supp.2d at 122. Congress has so far not chosen to act, and the courts are not at liberty to fill the gap.[39]
III.
I recognize that my conclusions about ABMSA and MSA lead to an anomalous result — the Micmacs are the sole Maine tribe not subject to some level of state jurisdiction. But courts may not ignore established principles of statutory construction or the canons of Indian law to avoid uncomfortable outcomes. The failure of MSA to take effect means that the Micmacs were left with the sovereign rights they otherwise would hold as a recognized Indian tribe under ABMSA. See Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 62 (1st Cir.2005) (“A tribe retains those aspects of sovereignty that have not been ‘withdrawn by treaty or statute, or by implication as a necessary result of [the tribe’s] dependent status.’ ”) (quoting United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)) (alteration in original), overruled on other grounds by Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16 (1st Cir.2006) (en banc)[40]; Fellencer, 164 F.3d at 709. Although that outcome is not what Congress anticipated,[41] it is nonetheless the inevitable result of the choice Congress made to explicitly rely on the state Micmac Act to frame the Maine-Micmac relationship.[42]
Our prior case law establishes that the sovereign rights retained by the Band *73 foreclose application of the state’s employment discrimination laws to the Micmacs. Cf. Fellencer, 164 F.3d at 711-13 (rejecting employment discrimination claim against the Penobscot Nation, relying, inter alia, on “ ‘the longstanding federal policy of providing a unique legal status to the Indians in matters of tribal employment’”) (quoting Morton v. Mancari, 417 U.S. 535, 548, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). I would therefore affirm the judgment of the magistrate judge.

. ABMSA § 2(b) provides, in relevant part: "It is the purpose of this Act to — (4) ratify the Micmac Settlement Act, which defines the relationship between the State of Maine and the Aroostook Band of Micmacs.”

. Section 6(b), which is labeled "Application of Federal law,” states: "For the purposes of application of Federal law, the Band and its lands shall have the same status as other tribes and their lands accorded Federal recognition under the terms of [MICSA].” Section 8, which is labeled "Implementation of the Indian Child Welfare Act,” provides:
For the purposes of this section, the Band is an ‘Indian tribe’ within the meaning of section 4(8) of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1903(8)), except that nothing in this section shall alter or affect the jurisdiction of the State of Maine over child welfare matters as provided by [MIC-SA].

. The majority asserts that my view that AMBSA wholly supplants MICSA was not argued by the Band. That is not so. In its brief, the Band argued that "[ujnder well-settled rules of construction, MICSA provisions may apply to the Band only as provided in ABM-SA.” Br. at 55. The Band then goes on to discuss the two incorporated MICSA provisions noted by the majority:
For example, Congress enumerated in ABMSA § 8(a) that the MICSA Child Welfare provisions apply to the Micmac. ABM-SA § 6(b) provides that federal law will apply to the Band as it does to other Maine tribes in MICSA. If Congress intended that all or any other parts of MICSA would apply to the Band, then it would not have specified those it did and not the others. It is a “fundamental principle of statutory construction that the specific trumps the general.” ... Clearly, all of MICSA cannot apply to the Band without rendering the specific inclusions meaningless surplusage.
Id. at 55-56. This position was also articulated by the Band at oral argument. In explaining the Micmacs' position in response to questions from the panel, counsel for the Band stated:
The 1980 law except where expressly ... noted by Congress cannot apply to deny the Band its right to self-government. Congress created a wholly separate statute for the Micmac.... The 1991 Act, and only the 1991 Act, except where Congress noted ... the 1980 Act would apply ...
At that point, a panel member asked: “So, the '91 Act basically eliminates the 1980 Act except where it expressly repeats?” Counsel replied: "Correct, your honor, that is our argument.”

. The MSA jurisdiction provision states, in relevant part: ''[T]he Aroostook Band of Micmacs and all members ... shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person....” Me.Rev.Stat. Ann. tit. 30, § 7203.

. The majority states that "[tjhere is no reason to believe that Congress intended to repeal § 1725(a) insofar as it provided a default rule in the event that the state Micmac Act were ineffective for some reason." See supra p. 62 (emphasis in original). The majority thus speculates that Congress would have invoked MICSA’s jurisdictional provision as a default if it had anticipated the ineffectiveness of the state law. That speculation is improper for at least two reasons. First, as noted infra, it is not inevitable that Congress would have legislated a specific relationship for Maine and the Micmacs if the State itself failed to do so. Congress did not explicitly incorporate in ABMSA the substance of MSA, and it may have made a deliberate choice to allow the State to define its own jurisdictional relationship with the Band. Moreover, even if there were a basis for a presumed congressional intent to impose state jurisdiction on the Band comparable to that found in MICSA, that is no justification for rewriting ABMSA. Judgments about congressional intent must have some basis in the language of the relevant statute, even if that language is ambiguous. The majority would incorporate by judicial fiat a default provision that would read something like this: "If the Maine Settlement Act fails to take effect, the Micmacs shall be subject to the jurisdictional terms of MICSA § 1725(a).” There is not a hint of such language in ABMSA.
Elsewhere, my colleagues note that, even if Congress through ABMSA had substituted MSA for MICSA with respect to state jurisdiction over the Band, “the correct conclusion would be that ABMSA had simultaneously ratified the relevant provision of the act into federal law." This assertion reflects the same flawed judgment about Congress's intent. The statute that Congress passed does not by its own terms impose state jurisdiction on the Band. Consequently, ABMSA's purpose to ratify MSA may reflect only an intent to endorse whatever jurisdictional relationship Maine enacted into law, and not an intent to adopt a particular Maine-Micmac relationship as a matter of federal law. Congress could have adopted the substance of MSA’s jurisdictional provision by incorporating it into ABMSA (as MICSA incorporated the jurisdictional provisions of the Maine Implementing Act), but Congress did not do so.

.In the official codification, a note is appended to each section of MSA stating that the provision was added to the code "pending receipt of certification of agreement by Council of Aroostook Band of Micmacs.” The notes following each subsection state that the act will become effective only if: (1) the United States enacts ratifying legislation that approves the act without modification; (2) the United States consents to amendments that would be made with the consent of the Aroos-took Band of Micmacs; and (3) within sixty days of the Legislature’s adjournment, the Secretary of State receives written certification from the tribal council that the Band has agreed to the act. It is undisputed that no certification was received by the Secretary of State.

. The majority opinion notes that whether the state Micmac Act became effective is a "difficult and complex issue of state law,” and my colleagues are reluctant to decide it without guidance from the Maine Supreme Judicial Court. As I shall explain, the issue is neither complicated nor just a matter of state law.

. As noted by the majority, the certification provision and the other contingencies for effectiveness were added to the pending Micmac bill late in the legislative process. The Band did not learn of the certification requirement until 1997.

. As noted earlier, § 2(b) provided, in relevant part, that “It is the purpose of this Act to — (4) ratify the Micmac Settlement Act, which defines the relationship between the State of Maine and the Aroostook Band of Micmacs.”

. I fully agree with the magistrate judge that the lack of a severability provision in ABMSA does not mean that the entire statute must be held invalid based on MSA’s ineffectiveness, which frustrated only one of ABMSA's purposes. Like her,
I am uncomfortable with the notion of reading an entire Congressional enactment out of existence, not because it is unconstitutional, but because one of its stated purposes has apparently failed. Congress can easily remedy that failure by adopting the terms of the [MSA] itself, if it chooses to do so.
403 F.Supp.2d at 123.

. Mairagansett rejected the distinction drawn in Aroostook Band of Micmacs between tribal sovereignty and tribal sovereign immunity. See 449 F.3d at 24-25.

. With quotations from two cases, the majority suggests that my statutory interpretation is indefensible because it would produce "absurd results” or "a chaotic hiatus in the law.’ ” I reject those characterizations. The restoration of Micmac sovereignty beyond what Congress had anticipated could hardly be called “absurd” and surely would not create "chaos.”

.I am not alone in reaching this conclusion. The same view was expressed in a memorandum prepared by Philip N. Hogen, an Associate Solicitor for the Department of the Interi- or, in connection with Maine's application to administer the Maine Pollutant Discharge Elimination System within Indian country. Hogen’s five-page memorandum was submitted to the Office of General Counsel of the U.S. Environmental Protection Agency along with a 31-page memorandum prepared by counsel for the Micmacs (who is also counsel for the Micmacs in this case) in consultation with attorneys from the Department of the Interior and the Department of Justice. Ho-gen noted that "[t]he Micmacs’ detailed legal memorandum incorporates comments from the two Departments and we concur with its conclusions.” His memo stated:
*73 The Department, as the primary federal agency responsible for interpreting the Maine Indian settlement acts, has analyzed the legal status of the Aroostook Band of Micmac Indians (Micmacs) and we conclude that under the Aroostook Band of Micmac Settlement Act (ABMSA), the Micmacs have retained their inherent tribal sovereignty.
The substance of the memo's analysis is reflected in three section headings: (1) “The 1989 State and 1991 Federal Micmac Settlement Acts Replaced the Earlier Settlement Acts to the Extent the Earlier Acts Applied to the Micmacs,” (2) "The [MSA] does not Subject the Micmacs to State Law because the [MSA] Never Became Effective,” and (3) "Congress Intended the [MSA] and ABMSA to Embody the Settlements with the Micmacs, thereby Repealing the Provisions of the [Maine Implementing Act] and MICSA Previously Applicable to the Micmacs.” In the last of those sections, the memo states: "To the extent Congress intended the earlier settlement acts to continue to apply to the Micmacs, Congress specified those sections in the ABMSA.”